UNITED STATES of America,
Plaintiff–Appellee,

v.

Joseph Willie KENNEDY, a/k/a Snake,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Walter Louis INGRAM, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellant,

v.

Walter Louis INGRAM, Defendant–
Appellee.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Walter Lee POWELL, a/k/a Stinkum,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Patricia Ann CARMICHAEL, a/k/a
Red Pat, Defendant–Appellant.

Nos. 92–5885, 92–5886, 93–5037,
93–5106 and 93–5142.

United States Court of Appeals,
Fourth Circuit.

Argued June 10, 1994.

Decided Aug. 17, 1994.

---

**ARGUED:** William B. Purpura, Baltimore, MD; Joseph Roll Conte, Bond, Conte & Norman, Washington, DC, for appellants. Andrea L. Smith, Asst. U.S. Atty., Baltimore, MD, for appellee. **ON BRIEF:** Gregory Burr Macaulay, Washington, DC; Charles Jerome Ware, Columbia, MD, for appellants. Lynne A. Battaglia, U.S. Atty., Philip S. Jackson, Asst. U.S. Atty., Baltimore, MD, for appellee.

Before WILKINSON and NIEMEYER, Circuit Judges, and WILLIAMS, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed in part; vacated and remanded in part by published opinion. Judge WILKINSON wrote the opinion, in which Judge NIEMEYER and Senior Judge RICHARD L. WILLIAMS joined.

## OPINION

WILKINSON, Circuit Judge:

Appellants raise numerous challenges to their convictions and sentences stemming from their involvement in a drug distribution conspiracy. We find that their challenges lack merit and therefore affirm the judgments below. We reverse, however, on the government's cross-appeal, and hold that a

drug conspiracy conviction may serve as the "instant offense" supporting a career offender status enhancement under § 4B1.1 of the Sentencing Guidelines.

## I.

In the spring of 1991, federal agents from the Drug Enforcement Administration ("DEA") began an investigation of the drug distribution activities of Alvin Stewart and Walter Ingram. The DEA agents initially placed dialed number recorders on Stewart and Ingram's telephones and monitored their beepers. Between September 1991 and April 1992, the investigators also conducted court-authorized wiretap surveillance on the telephones of Stewart, Ingram, and Ingram's family members.

The wiretaps revealed the existence of a complex drug distribution network centered around Ingram. Ingram would receive cocaine from Stewart or Joseph Kennedy and would either directly distribute it to other cocaine distributors or order his "workers" to prepare it for street distribution. Ingram's workers included (1) Patricia Carmichael, who supervised street distribution for Ingram, (2) Charles Spencer, who permitted Ingram to use his apartment for drug-related business and collected money for street cocaine sales, and (3) Walter Powell, who ran errands for Ingram and helped him to collect money from other drug dealers. Through the investigation, the federal agents also discovered that Stewart and Kennedy each had their own, smaller drug distribution network.

In March 1992, federal and state investigators searched the homes of Spencer, Kennedy, and Ingram pursuant to warrant, and recovered incriminating items at each house. More specifically, they recovered drug-related paraphernalia containing cocaine residue at Spencer's home; cocaine, large amounts of cash, and a loaded .38 caliber revolver at Kennedy's house; and an electronic telephone book containing the numbers of Kennedy, Stewart, and Carmichael at Ingram's apartment.

On April 14, 1992, a federal grand jury for the District of Maryland charged Ingram, Kennedy, Powell, Carmichael, Spencer, and three others involved in the drug distribution operation with one count of conspiracy to distribute and possess with intent to distribute a mixture of substances containing a detectable amount of cocaine. *See* 21 U.S.C. §§ 841(a)(1) & 846. A single jury trial for the charged defendants began on September 10, 1992. Several days after the trial began, however, the district court granted the defendants' collective motion to sever the trial, and ordered that all defendants except Ingram proceed to a new trial. The trial then continued with Ingram as the sole remaining defendant, and the jury returned a guilty verdict against him on September 23, 1992. Later that month, Kennedy went to trial with two members of his drug distribution network. His co-defendants changed their pleas to guilty shortly after the trial began, and the jury found Kennedy guilty in October 1992. Finally, the remaining defendants— Carmichael, Spencer, and Powell—were tried together in November 1992, and also found guilty.

Ingram, Kennedy, Carmichael, and Powell now appeal their convictions and resulting sentences, alleging error in various aspects of the district court's pretrial, trial, and sentencing rulings. The government also filed a cross-appeal on a sentencing issue involving appellant Ingram. The various appeals have been consolidated for review.

## II.

Appellant Kennedy first contends that the district court erred in denying his pretrial motion to suppress evidence seized from his home. On March 26, 1992, DEA agents and Baltimore County police officers executed a state search warrant for Kennedy's house. In executing the warrant, the agents and officers gathered on the back porch of the house, knocked on the back door, yelled "Police" several times, and then broke down the door. During the search that followed, the officers seized a fully loaded revolver, 150 vials of cocaine, and cash in excess of $27,000.

██ Kennedy argues that the recovered evidence should have been excluded because the underlying search violated the reasonableness standard of the Fourth Amendment. In making this argument, Kennedy relies on

the federal "knock and announce" statute, which provides, in relevant part, that an officer may

> break open any outer or inner door or window of a house . . . to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance. . . .

18 U.S.C. § 3109. Because this statute "encompasses the constitutional requirements of the fourth amendment," it not only governs federal searches by federal agents, but also provides the proper framework for analyzing the execution of state search warrants. *United States v. Singer*, 943 F.2d 758, 761 (7th Cir.1991); *see also United States v. Buckley*, 4 F.3d 552, 558 (7th Cir.1993); *Simons v. Montgomery County Police Officers*, 762 F.2d 30, 33 (4th Cir.1985). According to Kennedy, the officers acted illegally in executing the state search warrant for his house because they failed to announce the purpose of their visit, and also failed to wait for a refusal of admittance before breaking down the back door of his house.

We disagree. It is true that the officers in this case broke into Kennedy's house immediately after knocking and yelling "Police," and failed to wait for an explicit refusal of admittance or the lapse of a significant amount of time before breaking into the premises. However, the officers' failure to wait for a response does not mandate a conclusion that the search was illegal. It is well-established that non-compliance with the knock and announce requirements may be excused where exigent circumstances render strict compliance imprudent. *See, e.g., United States v. Lalor*, 996 F.2d 1578, 1584 (4th Cir.1993); *United States v. Nabors*, 901 F.2d 1351, 1354 (6th Cir.1990); *United States v. Spinelli*, 848 F.2d 26, 28 (2d Cir.1988). Whether exigent circumstances existed at the time of the entry, and whether the degree of the exigency was sufficient to justify the extent of the noncompliance, is determined by an analysis of the facts of each case. *See United States v. Lucht*, 18 F.3d 541, 549 (8th Cir.1994). As a general matter, however, exigent circumstances have been found to exist where the officers at the premises reasonably believed that waiting for a response before entering the premises would

create an opportunity for the occupants to destroy relevant evidence or to prepare an attack against them. *See Lalor*, 996 F.2d at 1584; *United States v. Arias*, 923 F.2d 1387, 1391 (9th Cir.1991). Indeed, because the possibility of destruction of evidence and danger to the officers are "two of the most common and compelling bases that establish exigency," *United States v. Bonner*, 874 F.2d 822, 826 (D.C.Cir.1989), courts have held that the presence of either will permit officers to make a forced entry simultaneously with the knock and announcement, or even without alerting the occupants at all, *see Buckley*, 4 F.3d at 558; *Mensh v. Dyer*, 956 F.2d 36, 40 (4th Cir.1991).

Here, the government produced ample evidence that the officers needed to act quickly in order to prevent the destruction of drugs inside Kennedy's house and to protect themselves from attack. First, the officers knew from their investigations that Kennedy had a criminal record involving drugs and was participating in the Ingram cocaine conspiracy. On the day of the warrant execution, agents had observed many people entering and exiting Kennedy's house, an indication of narcotics transactions taking place inside. The agents had a reasonable basis for believing that the experienced drug distributors inside the house would attempt to destroy evidence unless the agents acted quickly. *See United States v. Moore*, 956 F.2d 843, 850 (8th Cir. 1992) ("It is reasonable for police officers to assume that suspects selling illegal drugs in small quantities from a residence that has normal plumbing facilities will attempt to destroy those drugs. . . .").

Second, the officers had reason to fear that the people inside Kennedy's house would be armed and dangerous. To begin with, "the law has 'uniformly recognized that substantial dealers in narcotics possess firearms'" and that "entrance into a situs of drug trafficking activity carries all too real dangers to law enforcement officers." *Bonner*, 874 F.2d at 824, 827 (quoting *United States v. Payne*, 805 F.2d 1062, 1065 (D.C.Cir.1986)); *see also Singer*, 943 F.2d at 763 (noting the "federal judiciary's recognition that firearms are an integral part of the drug trade"). Apart from this general knowledge that guns are

common in drug transactions, the officers also had particular reasons to suspect the presence of guns in Kennedy's home. The officers knew that Kennedy's network included dealers with prior convictions involving firearms, and that Joseph Kennedy's son, Michael Kennedy, had been seen with a handgun. Moreover, Michael Kennedy had told DEA Agent Kula during a previous automobile stop that if he was arrested for "something big" in the future, it would be for "killing a cop." Based on the above information, the officers reasonably inferred that the occupants of Kennedy's house would be carrying guns and would attempt to use them against the officers if given the opportunity.

Notwithstanding the exigent and dangerous circumstances, the officers in this case went the extra mile. They "satisfied the principal values embodied in section 3109" by knocking on Kennedy's door and informing the occupants of their authority. *Bonner,* 874 F.2d at 827. The circumstances amply justified their failure to comply with the remaining requirement of waiting for a response. We accordingly hold that the officers' execution of the search warrant did not violate the requirements of 18 U.S.C. § 3109.

### III.

Appellants next allege numerous errors at trial resulting in impermissible convictions. We address each contention in turn.

### A.

■ Ingram and Kennedy both contend that the evidence at their respective trials varied impermissibly from the allegations of the indictment. In general, a "variance" occurs when the evidence at trial establishes facts materially different from those alleged in the indictment. *See United States v. Tarantino,* 846 F.2d 1384, 1391 (D.C.Cir.1988); *United States v. Caporale,* 806 F.2d 1487, 1499 (11th Cir.1986). In a conspiracy prosecution, a defendant may establish the existence of a material variance by showing that the indictment alleged a single conspiracy but that the government's proof at trial established the existence of multiple, separate conspiracies. *See Kotteakos v. United States,* 328 U.S. 750, 755–56, 66 S.Ct. 1239,

1243, 90 L.Ed. 1557 (1946); *United States v. Jones,* 880 F.2d 55, 66 (8th Cir.1989). Here, appellants argue that the indictment alleged a single conspiracy involving all the named defendants, but that the government's proof at trial demonstrated the existence of three separate conspiracies: (1) Stewart and his distribution network, (2) Ingram and his workers, including Carmichael, Spencer, and Powell, and (3) Kennedy and his suppliers. Appellants argue that this variance permitted the government to present evidence of all the conspiracies against them as aggregated co-conspirator evidence, and created the possibility that the jury would unfairly transfer the guilt of the members of a separate conspiracy to them.

■ We are unpersuaded. Appellants have failed to show that they suffered any prejudicial effect from the alleged variance. A variance constitutes a legitimate grounds for reversal only if the appellant shows that the variance infringed his "substantial rights" and thereby resulted in actual prejudice. *See, e.g., United States v. Prince,* 883 F.2d 953, 959 (11th Cir.1989); *United States v. Goldman,* 750 F.2d 1221, 1226–27 (4th Cir.1984). In order to show actual prejudice stemming from a multiple conspiracy variance, an appellant must prove that "there are so many defendants and so many separate conspiracies before the jury" that the jury was likely to transfer evidence from one conspiracy to a defendant involved in an unrelated conspiracy. *Caporale,* 806 F.2d at 1500; *see Tarantino,* 846 F.2d at 1391.

In this case, there was no possibility that evidence from unrelated conspiracies would be improperly attributed to individual defendants. As an initial matter, this case involves eight defendants and, at most, three related conspiracies. Courts have held that cases involving similar numbers of defendants and conspiracies are "not so complex by definition that the jury will be unable to segregate the evidence properly." *Caporale,* 806 F.2d at 1501 (eleven defendants and two possible conspiracies); *see Berger v. United States,* 295 U.S. 78, 80–84, 55 S.Ct. 629, 630–31, 79 L.Ed. 1314 (1935) (four defendants and two possible conspiracies); *Jones,* 880 F.2d

at 66 (five defendants and two possible conspiracies). Moreover, the district court took the extra step of ordering a severance in this case to ensure that evidence unrelated to each defendant's own activities would not be admitted against him. As a result, both Ingram and Kennedy ultimately stood trial alone, and evidence at each trial focused on the individual appellant's own role in the conspiracy and the direct consequences of that defendant's actions in furthering the conspiracy. *See United States v. Anguiano*, 873 F.2d 1314, 1318 (9th Cir.1989) ("there is no problem of spillover when, as in this case, the defendant stands trial alone"); *United States v. Corey*, 566 F.2d 429, 431 n. 3 (2d Cir.1977) (holding that any variance "could not have prejudiced the defendant by spillover or otherwise" because "appellant stood trial alone"). We hold that the alleged evidentiary variances in this case present no basis for the reversal of any convictions.

### B.

Ingram and Kennedy next contend that the district court committed reversible error in failing to give a multiple conspiracy instruction to the jury. They claim once again that the evidence at their respective trials proved the existence of multiple conspiracies, and that the jury should have been instructed accordingly.

 The evidence in this case, however, did not support a multiple conspiracy instruction. *See United States v. Mills*, 995 F.2d 480, 485 (4th Cir.1993) ("A court need only instruct on multiple conspiracies if such an instruction is supported by the facts."). A multiple conspiracy instruction is not required unless the proof at trial demonstrates that appellants were involved only in "separate conspiracies *unrelated* to the overall conspiracy charged in the indictment." *United States v. Castaneda–Cantu*, 20 F.3d 1325, 1333 (5th Cir.1994) (emphasis added). Here, Ingram and Kennedy did not make an

adequate showing that they were involved in conspiracies unrelated to the single conspiracy charged in the indictment. As the district court explained, although it is conceivable that Stewart's group and Kennedy's group constituted separate conspiracies, there was ample evidence that the groups were related by virtue of their extensive and long-lasting distributional relationships with Ingram. Therefore, we find that the district court's refusal to instruct on multiple conspiracies in the trials of Ingram and Kennedy was not in error. *See Mills*, 995 F.2d at 485.[1]

### C.

After the first trial began in this case, the district court granted a motion to sever as to all defendants except Ingram, and decided that the trial should continue with Ingram as the sole remaining defendant. Ingram requested a mistrial at that time, but the district court denied his motion. Ingram now contends that the district court's refusal to declare a mistrial prejudiced him in two ways. First, he claims that because all his co-defendants were dismissed in the middle of the trial, his position as the sole remaining defendant created an appearance of guilt. Second, Ingram claims error in the district court's prior admission of evidence regarding (1) the DEA agents' seizure of cocaine and drug-related paraphernalia from members of Stewart's distribution network, and (2) Stewart's drug acquisition trip to New Jersey. He argues that this evidence was unrelated to his own culpability, and that the district court should have conducted a new trial after the severance to ensure that the jury would not attribute this previously admitted evidence to him.

 We find this argument meritless. Once a trial court orders a severance, it "has sound discretion over who is to be retained and who is to be severed." *United States v. Aguiar*, 610 F.2d 1296, 1301 (5th Cir.1980).

---

1. Even if the evidence were read to support a multiple conspiracy instruction, the district court's failure to give such an instruction is not reversible error "unless the defendants demonstrate that they have been prejudiced by the variance" between the single conspiracy charged in the indictment and the multiple conspiracies

proven at trial. *United States v. Curry*, 977 F.2d 1042, 1052 (7th Cir.1992) (quoting *United States v. Townsend*, 924 F.2d 1385, 1410 (7th Cir. 1991)). As we have explained above, *see supra* § III.A., neither appellant could have suffered any prejudice even if multiple conspiracies were proven in this case.

Accordingly, we review the district court's denial of a defendant's mistrial motion following severance of his co-defendants under an abuse of discretion standard. *See United States v. Huebner,* 16 F.3d 348, 353 (9th Cir.1994).

Here, the district court granted the motion to sever as to most defendants because it was concerned that the overwhelming evidence of drug distribution activities of Ingram, Stewart, and Kennedy would have an unfair spillover effect on the conspiracy's minor participants. In considering whether to proceed with Ingram's trial, the district court considered the potential impact of the severance and the prior admission of the evidence involving Ingram's co-conspirators' activities, and specifically found that "Walter Ingram has not yet been unfairly prejudiced by any evidence which has been introduced." The court explained that the severance did not adversely impact Ingram because the majority of the evidence admitted up to that point was, in fact, relevant to the charge against him. Moreover, the court gave a curative instruction to the jury to minimize any alleged prejudice stemming from the denial of a mistrial. We believe that the district court handled the severance in a careful manner, and that it properly found that Ingram's trial was not impermissibly tainted by evidence submitted prior to severance of the other defendants. Accordingly, the district court did not abuse its discretion in ordering the continuance of the trial with Ingram as the sole defendant. *See Huebner,* 16 F.3d at 353 (finding no abuse of discretion where the district court gave a curative instruction and where "[m]uch of the evidence was, in fact, relevant to the charges against [appellant]").

### D.

Appellant Kennedy next contends that the district court abused its discretion by admitting prejudicial "other crimes" evidence. At Kennedy's trial, the court admitted the testimony of Corporal Whitmire of the Baltimore County Police Department. In 1990, before the federal DEA investigation had begun, Whitmire began a separate investigation into the drug distribution activi-

ties of Kennedy and his suppliers, who were not named in the indictment in this case. According to Kennedy, the conspiracy that Whitmire investigated was a separate crime from the conspiracy at issue here because it involved different people and fell outside the charged conspiracy period—*i.e.,* September 1991 to March 1992. Kennedy argues that Whitmire's testimony regarding his investigation therefore constituted evidence of "other crimes, wrongs, or acts" under FED. R.EVID. 404(b). He concludes that the district court erred in admitting Whitmire's testimony and in failing to give a limiting instruction to the jury regarding the relevance of this evidence.

The basic flaw in Kennedy's argument is that the challenged testimony did not constitute "other crimes" evidence within the meaning of Rule 404(b). Kennedy's argument erroneously assumes that all evidence falling outside the charged conspiracy period necessarily involves a separate, unrelated offense subject to the strictures of that Rule. It is well-established, however, that the mere fact that the evidence involved activities occurring before the charged time frame of the conspiracy does not automatically transform that evidence into "other crimes" evidence. *See United States v. Towne,* 870 F.2d 880, 886 (2d Cir.1989) (holding that evidence that defendant illegally possessed a weapon on days other than the date charged in the indictment was not "other crimes" evidence); *United States v. Bagaric,* 706 F.2d 42, 65 (2d Cir.1983) ("There is no requirement that all the Government's evidence fall within the time period of the indictment, providing it is relevant to the charges."). Rather, evidence of uncharged conduct is not considered "other crimes" evidence if it "arose out of the same ... series of transactions as the charged offense, ... or if it is necessary to complete the story of the crime (on) trial." *Towne,* 870 F.2d at 886 (quoting *United States v. Weeks,* 716 F.2d 830, 832 (11th Cir.1983)).

Here, the subject of Whitmire's testimony was not separate from and unrelated to the charged conspiracy. Rather, this testimony served two important functions. First, it constituted predicate evidence necessary to

provide context to the Ingram–Stewart–Kennedy drug distribution scheme that took place within the charged time frame. *See United States v. Mark*, 943 F.2d 444, 448 (4th Cir.1991) (holding that evidence of uncharged criminal activity is admissible "where it 'furnishes part of the context of the crime.'") (quoting *United States v. Rawle*, 845 F.2d 1244, 1247 n. 4 (4th Cir.1988)). The testimony proved Kennedy's participation in drug distribution activities, and addressed Kennedy's sources for the cocaine that he supplied to Ingram during the charged conspiracy period. By providing the jury with background information on Kennedy's activities during the preparatory stages of the conspiracy, this evidence "served to complete the story of the crime on trial." *United States v. Masters*, 622 F.2d 83, 87 (4th Cir.1980). Second, Whitmire's testimony served as evidence of a subset of the charged conspiracy—Kennedy's own distribution network—that helped the jury to understand how Kennedy's group obtained its cocaine and how that group related to and became part of the bigger Ingram–Stewart–Kennedy conspiracy. Therefore, we hold that Whitmire's testimony did not constitute "other crimes" evidence under Rule 404(b), and that the district court acted well within its discretion in admitting this testimony as proof of the existence and structure of the charged drug distribution conspiracy. *See United States v. Bailey*, 990 F.2d 119, 122 (4th Cir.1993). To overturn the district court would prevent the prosecution from presenting to the jury the true scope and magnitude of the unlawful activities involved.

### E.

Finally, Powell contends that the government's evidence was insufficient to prove that he knowingly participated in a conspiracy to distribute cocaine. He argues that the evidence showed, at most, that he associated with individuals engaged in drug distribution activities. He maintains that the government failed to prove that he made an agreement with any of these associates to engage in drug-related activity.

■■■■ We are not persuaded by this argument. The jury's finding that Powell participated in a drug distribution conspiracy must be sustained as long as it is supported by substantial evidence. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). In determining whether substantial evidence exists, we must "construe the evidence in the light most favorable to the government, assuming its credibility, [and] drawing all favorable inferences from it...." *United States v. Giunta*, 925 F.2d 758, 764 (4th Cir.1991). Accordingly, our review of the evidence presented at trial is limited to the narrow question of whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■■■■ Our review of the record in this case reveals that the jury's finding of Powell's participation in the charged drug distribution conspiracy was well-supported. The government may establish a violation of 21 U.S.C. § 846 by presenting evidence of "(1) an agreement between two or more persons to undertake conduct that would violate the [federal] laws ... relating to controlled substances and (2) the defendant's wilful joinder in that agreement." *United States v. Clark*, 928 F.2d 639, 641–42 (4th Cir.1991). The government may use circumstantial evidence to establish a defendant's participation in a conspiracy. *See Glasser*, 315 U.S. at 80, 62 S.Ct. at 469. In the instant case, the government presented wiretap evidence of sixteen conversations between Powell and Ingram or Carmichael indicating that he ran drug-related errands for Ingram and assisted Ingram in his efforts to collect money from other drug distributors. On one occasion, for example, Ingram instructed Powell to tell "LaLa," a street dealer, to pay the money he owed. During another telephone conversation regarding "LaLa," Powell offered money to "help [Ingram] out in some kind of way." This evidence was plainly sufficient to establish Powell's knowledge of Ingram's involvement in a conspiracy to distribute cocaine and his participation in activities furthering the goals of that conspiracy. We therefore find that there was ample evidence to support Powell's conviction.

## IV.

■ Appellant Ingram challenges his sentence on the ground that the district court improperly calculated his base offense level. Ingram received a base offense level of 32 because of his knowledge of at least 5 kilograms of cocaine within the conspiracy's operations. *See* U.S.S.G. § 2D1.1(c)(6). Ingram argues that the district court erred in not articulating a factual basis for finding that at least 5 kilograms of cocaine were attributable to him. More specifically, Ingram asserts that the district court should have made specific findings as to when his drug transactions occurred and how much cocaine was involved in each transaction, and then calculated the total amount of cocaine attributable to him.

We find no merit in this argument. The Sentencing Guidelines provide that "[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall *approximate* the quantity of the controlled substance." U.S.S.G. § 2D1.1, Commentary (n.12) (emphasis added). Because there were only a few drug seizures involved in this case, the district court grounded its calculation of Ingram's base offense level on a careful evaluation of the wiretap evidence presented at trial and briefed by both sides at sentencing. More specifically, the court heard conversations in which Ingram agreed to sell ¼ to½ kilograms of cocaine (per transaction) to his various co-conspirators, offered to buy similarly large amounts of cocaine from others, and requested money for the drugs he had already distributed. The court stated that it did not "view these conversations here as being a puffing" or an exaggeration of the actual amounts of cocaine involved in the telephone negotiations between Ingram and his coconspirators. Based on this evidence, the court

found that Ingram was a "major player in street distribution" who was "daily involved in drug dealing," and concluded that the amounts mentioned in the conversations totalled ·more than five kilograms of cocaine.

■ The district court's articulation of the factual basis for the base offense level was proper. Because the Guidelines provide that "[i]n an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount," *see id.,* the calculation did not need to be based on *any* completed transaction. It follows that the court certainly did not need to make specific findings as to the date of each distribution transaction and the amount involved in those transactions. Instead, the court properly stated the bases for its approximation of the quantity of cocaine involved in Ingram's discussions with his co-conspirators. We therefore hold that the court's attribution of at least 5 kilograms to appellant was not clearly erroneous. *See United States v. Adams,* 988 F.2d 493, 495 (4th Cir.1993).[2]

## V.

At Ingram's sentencing hearing, the government sought to classify him as a career offender under § 4B1.1 of the Sentencing Guidelines. Section 4B1.1 provides that a defendant is a career offender if

(1) the defendant was at least eighteen years old at the time of the instant offense,

(2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and

(3) the defendant has at least two prior felony convictions of either a crime of

2. Patricia Carmichael also challenges her sentence, claiming that the district court should have departed downward from the imprisonment term mandated by the Sentencing Guidelines based on her chronic drug addiction. Section 5H1.4 of the Sentencing Guidelines, however, plainly provides that "[d]rug or alcohol dependence or abuse is not a reason for imposing a sentence below the guidelines." U.S.S.G. § 5H1.4. Accordingly, this court has held that "drug abuse ... may not, under even extraordi-

nary circumstances, ... support a downward departure." *United States v. Deigert,* 916 F.2d 916, 919 n. 2 (4th Cir.1990); *see United States v. Goff,* 907 F.2d 1441, 1445 (4th Cir.1990) (reversing a district court's decision to depart downward based on defendant's drug addiction). Therefore, we affirm the district court's decision to sentence Carmichael to 110 months imprisonment, the minimum allowable sentence under the applicable Guidelines range.

violence or a controlled substance offense.

U.S.S.G. § 4B1.1. After considering Ingram's criminal history at sentencing, the district court decided that § 4B1.1 did not apply to Ingram. The government now appeals this ruling, claiming that Ingram satisfies all three elements of § 4B1.1. Because both sides agree that Ingram was older than 18 at the time this conspiracy offense took place, we need address only the second and third elements of § 4B1.1.

### A.

To give rise to career offender status under § 4B1.1, the "instant offense of conviction" must be a "crime of violence" or "a controlled substance offense." U.S.S.G. § 4B1.1(2). Application note 1 to § 4B1.2 provides that "the offenses of aiding and abetting, *conspiring,* and attempting to commit [drug] offenses" constitute "controlled substance" offenses and therefore may serve as career offender crimes. (emphasis added). Therefore, Ingram's instant offense of conviction—conspiracy to distribute cocaine in violation of 21 U.S.C. § 846—would clearly qualify as a career offender offense under the Guidelines provisions and commentaries. *See United States v. Whitaker,* 938 F.2d 1551, 1552 (2d Cir.1991) (per curiam) (permitting a conviction for drug conspiracy to serve as a "controlled substance offense"); *United States v. Jones,* 898 F.2d 1461, 1462 (10th Cir.1990) (same).

Ingram nonetheless contends that his conspiracy conviction cannot qualify as a "controlled substance offense" for purposes of § 4B1.1. In making this argument, Ingram relies on *United States v. Price,* 990 F.2d 1367 (D.C.Cir.1993), which held that the Sentencing Commission exceeded its statutory mandate in including drug conspiracy offenses in the definition of "controlled substance offense." *See id.* at 1368; *see also United States v. Bellazerius,* 24 F.3d 698, 700–02 (5th Cir.1994). The background com-

mentary to § 4B1.1 explains that the career offender provision "implements th[e] mandate" of 28 U.S.C. § 994(h). Section 994(h), in turn, directs the Commission to require a sentence "at or near the maximum term" for defendants convicted of "an offense described in" specific federal narcotics statutes. 28 U.S.C. § 994(h)(1)(B).[3] The *Price* and *Bellazerius* courts held that the Sentencing Commission did not have the authority to include conspiracy offenses as career offender crimes because (1) the Commission relied solely on the mandate of 28 U.S.C. § 994(h) in promulgating § 4B1.1, and (2) conspiracy offenses are not enumerated in § 994(h). *See Price,* 990 F.2d at 1368; *Bellazerius,* 24 F.3d at 701–02.

We respectfully decline to adopt the reasoning of those courts. First, it is not dispositive that conspiracy narcotics offenses are not enumerated in § 994(h), because § 994(h) is not the sole basis for the career offender provision. Although the commentary to § 4B1.1 states that the career offender section was intended to implement the mandate of § 994(h), it does not suggest that § 994(h) is the *only* authority for the provision. *See United States v. Heim,* 15 F.3d 830, 832 (9th Cir.1994). To the contrary, the Introduction to the Sentencing Guidelines explicitly states that the Commission relied on the broad powers granted by its enabling statute, 28 U.S.C. § 994(a), in issuing all guidelines and policy statements. *See* U.S.S.G. Ch.1, Pt.A, § 1. Accordingly, the "authority granted by § 994(a) is implicit in all the provisions of the guidelines," and a reference in the commentary to § 994(h) as a specific source of authority does not preclude additional reliance on the general § 994(a) powers. *United States v. Damerville,* 27 F.3d 254, 257 (7th Cir.1994). We believe, therefore, that the career offender provision of the Sentencing Guidelines was promulgated pursuant to the Commission's general au-

---

**3.** Section 994(h) states in relevant part that

The Commission shall assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old or older and—
(1) has been convicted of a felony that is—
(A) a crime of violence; or

(B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and section 1 of the Act of September 15, 1980 (21 U.S.C. 955a);....

28 U.S.C. § 994(h).

thority under § 994(a) as well as its more specific authority under § 994(h). *See id.; United States v. Baker,* 16 F.3d 854, 857 (8th Cir.1994); *Heim,* 15 F.3d at 832.

 Section 994(a) contains a broad, general mandate to promulgate guidelines for the determination of sentences, and thereby grants the Commission "significant discretion in formulating guidelines." *Mistretta v. United States,* 488 U.S. 361, 377, 109 S.Ct. 647, 657, 102 L.Ed.2d 714 (1989). Specifically, the statute confers upon the Commission the power to promulgate guidelines

for use of a sentencing court in determining the sentence to be imposed in a criminal case, including ...

(B) a determination as to the appropriate amount of a fine or the appropriate length of a term of probation or a term of imprisonment....

28 U.S.C. § 994(a)(1). This statutory language authorizes the Commission to require that narcotics conspiracy offenses be subject to maximum sentences under § 4B1.1. *See Damerville,* 27 F.3d at 257; *United States v. Allen,* 24 F.3d 1180, 1186–87 (10th Cir.1994). Therefore, we hold that the Sentencing Commission did not exceed its statutory authority by "includ[ing] conspiracy as an offense subject to treatment by the career offender provisions pursuant to its general authority under [28 U.S.C.] § 994(a)." *Damerville,* 27 F.3d at 257.

 Second, even if § 994(h) provided the sole basis of authority for implementing the career offender provision, we would nonetheless uphold the Sentencing Commission's interpretation of § 994(h) as authorizing narcotics conspiracies to serve as a career offender controlled substance offense. The Sentencing Commission brings expertise to the implementation of its mandate, and we must accordingly defer to its interpretation as long as it is " 'sufficiently reasonable' in light of the congressional directive." *United States v. Rivera,* 996 F.2d 993, 995 (9th Cir. 1993) (quoting *United States v. Nelson,* 919 F.2d 1381, 1382 (9th Cir.1990); *United States v. Consuegra,* 22 F.3d 788, 789 (8th Cir.1994).

 Here it was reasonable for the Commission to interpret Congress' directive in § 994(h) as permitting inclusion of drug-related offenses other than the offenses specifically enumerated in § 994(h). The legislative history indicates that the list of offenses contained in § 994(h) is "not necessarily intended to be an exhaustive list of types of cases in which ... terms at or close to authorized maxima should be specified." S. REP. No. 225, 98th Cong., 2d Sess. 176 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3359; *see also United States v. Parson,* 955 F.2d 858, 867 (3d Cir.1992) (noting that § 994(h) serves "as a floor for the career offender category, not as a ceiling"). Congress further directed the Commission to engage in a "guidelines development process [that] can assure consistent and rational implementation of the Committee's view that substantial prison terms should be imposed on repeat violent offenders and repeat drug traffickers." S. Rep. No. 225, at 175, *reprinted in* 1984 U.S.C.C.A.N. at 3358. In view of these directives, it was reasonable for the Commission to interpret the statute as authorizing the promulgation of a career offender provision that includes offenses involving the same type of drug trafficking conduct as the enumerated offenses. *See United States v. Hightower,* 25 F.3d 182, 185–87 (3d Cir.1994) (holding that the Commission has the authority to expand the definition of controlled substance offense beyond the enumerated list contained in § 994(h)); *United States v. Brown,* 23 F.3d 839, 841 (4th Cir.1994) (same); *Rivera,* 996 F.2d at 996 (holding that § 994(h) simply delineates the "types of conduct" that should be part of the career offender provision).

Conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846 is a drug trafficking offense that carries the same penalty as a violation of 21 U.S.C. § 841, which is one of the offenses enumerated in § 994(h). *See* 21 U.S.C. § 846. By including conspiracy as a career offender offense, the Commission ensured that persons engaged in a collective drug distribution scheme would receive the same treatment as individual violators of similarly serious drug trafficking laws. As a matter of simple logic, a conviction of conspiracy to distribute controlled substances would seem to qualify as a federal

narcotics offense. We believe that the Commission did not exceed its statutory authority in including conspiracy within the definition of "controlled substance offense" in § 4B1.1, and accordingly hold that such conspiracy convictions may serve as career offender crimes. See Damerville, 27 F.3d at 257; Hightower, 25 F.3d at 187; Allen, 24 F.3d at 1187; Heim, 15 F.3d at 831–32.

### B.

The third requirement of § 4B1.1 is that the defendant have "at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(3). The Guidelines further provide that, for purposes of determining career offender status, only sentences "imposed within fifteen years of the defendant's commencement of the instant offense" or sentences that "resulted in the defendant being incarcerated during any part of such fifteen-year period" are counted. U.S.S.G. § 4A1.2(e)(1); see also U.S.S.G. § 4B1.2, Commentary (n.4) (stating that § 4A1.2(e)(1) applies to the counting of convictions under § 4B1.1).

The government argued at sentencing that Ingram was a career offender because his prior record included two violent felony convictions: (1) a 1986 assault conviction and (2) a 1973 assault conviction for which Ingram was released on August 19, 1976. The district court held, however, that Ingram's 1973 assault conviction could not count as a predicate felony conviction for career offender status. In so holding, the court relied on the allegation in the indictment that the instant conspiracy offense began "on or about September 1, 1991," and reasoned that Ingram's release from incarceration for the 1973 offense took place fifteen years and twelve days before the beginning of the charged conspiracy period. The court therefore decided that Ingram did not meet the third element of § 4B1.1 and accordingly could not be classified a career offender under that provision.

The government contends on appeal that the district court was not bound by the dates stated in the indictment, and that the court has the authority to make a factual finding, based on the trial record, as to when the instant drug conspiracy offense actually started. According to the government, the district court should have calculated the 15–year period from the actual starting date of the conspiracy, not from the date alleged in the indictment.

■ We agree. The problem with the district court's adherence to the date alleged in the indictment is that the Guidelines explicitly provide that, in determining the date of the "commencement of the instant offense" for purposes of calculating the 15–year time period, the sentencing court should consider "any relevant conduct." U.S.S.G. § 4A1.2, Commentary (n.8). "Relevant conduct," in turn, includes "all acts ... committed [or] aided ... by the defendant" and, in the case of a conspiracy, "all reasonably foreseeable acts and omissions of others in furtherance of the [conspiracy]" that occurred "in preparation for that offense." U.S.S.G. § 1B1.3(a)(1) (emphasis added). This broad concept of "relevant conduct" includes activities that occurred before the date identified by the indictment as the starting date of the offense. See U.S.S.G. § 1B1.3, Commentary (background) (providing that "[c]onduct that is not formally charged or is not an element of the offense of conviction may enter into the [sentencing] determination"); United States v. Strachan, 968 F.2d 1161, 1163 (11th Cir.1992) (stating that relevant conduct includes "that conduct which is not formally charged or adjudicated"). Therefore, courts are not restricted to the allegations in the indictment in determining the date of the "commencement of the instant offense" under § 4A1.2(e); rather, sentencing courts may consider preindictment activity to establish the starting date of the offense, and then use that date to calculate the time period for which prior sentences are counted. See United States v. Harris, 932 F.2d 1529, 1538 (5th Cir.1991) (holding that "pre-indictment activities may properly be considered when determining the applicability of section 4A1.1(d) or (e)"); United States v. Eske, 925 F.2d 205, 207–08 (7th Cir.1991) (holding that the sentencing court properly used a date preceding the starting date alleged in the indictment to determine the applicable prior sentence time period); see also United States v. Kayfez, 957 F.2d 677, 678 (9th Cir.1992) (per curiam) (holding that the district court

was not bound by the starting date of the offense alleged in the indictment for purposes of calculating criminal history points).

▮ In this case, the district court had the authority to look beyond the September 1, 1991, date identified in the indictment in determining the date from which the 15–year period is projected. Accordingly, we vacate Ingram's sentence and remand with instructions that the district court consider all relevant conduct pertaining to the conspiracy in determining when that conspiracy began. If the court determines that conspiratorial activities began on or before August 19, 1991, then it must find Ingram to be a career offender under § 4B1.1 and sentence him accordingly.[4]

## VI.

For the foregoing reasons, we affirm the district court's judgments of conviction with respect to all appellants. We affirm all sentences as well, with the exception of defendant Ingram's sentence. Regarding Ingram, we vacate his sentence and remand to the district court for resentencing in accordance with this decision.

*AFFIRMED IN PART; VACATED AND REMANDED IN PART.*

---

4. At sentencing, the district court enhanced Ingram's criminal history category by three levels under § 4A1.3, which provides for an upward departure where "reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct...." Ingram contends on appeal that the district court erroneously relied on (1) five convictions that were reversed on appeal for technical reasons and (2) one outdated assault conviction—*i.e.*, a conviction falling outside the 15–year period—as the basis for the upward departure.

We find this argument meritless. The Sentencing Commission plainly provided that a court may consider a sentence imposed outside the applicable 15–year period "in determining whether an upward departure is warranted under § 4A1.3." U.S.S.G. § 4A1.2, Commentary (n.8). Moreover, this court has held that sentencing courts may make a § 4A1.3 upward departure based on "conduct underlying even an invalid, or arguably so, conviction" as long as the

district court finds that the conviction provides reliable evidence of past criminal activity. *United States v. Jones*, 907 F.2d 456, 465–66 (4th Cir.1990).

Here, the district court found that Ingram's outdated assault conviction and the five reversed convictions provided reliable evidence of past criminal conduct that the criminal history category did not adequately represent. More specifically, the court agreed with the government that the reversed convictions were reliable because the reversals were based on technical errors, such as a violation of the state speedy trial rule or a violation of the Interstate Agreement on Detainers. The district court did not err in making a § 4A1.3 upward departure based on the challenged convictions.

Accordingly, if the district court finds on remand that Ingram cannot be classified as a career offender under § 4B1.1 because the 1973 assault conviction does not fall within the relevant 15–year period, the district court may enhance Ingram's criminal history category under § 4A1.3.