**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                              No. 97-4329

DON PRINCE,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.
                                                               No. 97-4334

ROGER DEWITT PRINCE, a/k/a Bill
Prince, a/k/a Ike Davis,
Defendant-Appellant.

Appeals from the United States District Court
for the District of South Carolina, at Columbia.
Joseph F. Anderson Jr., District Judge.
(CR-96-122)

Argued: June 8, 1999

Decided: July 20, 1999

Before MURNAGHAN, LUTTIG, and MOTZ,
Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Jack Bruce Swerling, Columbia, South Carolina, for Appellants. John Michael Barton, Assistant United States Attorney, Columbia, South Carolina, for Appellee. **ON BRIEF:** Jack W. Lawson, Florence, South Carolina, for Appellant Roger Prince. J. Rene Josey, United States Attorney, Scarlett Wilson, Assistant United States Attorney, Columbia, South Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

A jury convicted two brothers, Don Prince and Roger Dewitt ("Bill") Prince, of conspiring in a murder-for-hire scheme directed at killing two persons expected to testify against Bill in connection with an earlier contract murder. Both brothers appeal, asserting that numerous errors require reversal of their convictions and sentences. Finding no reversible error, we affirm.

I.

In 1992, a South Carolina state court tried and convicted Bill Prince, along with Charlie Dorn Smith, of conspiracy and solicitation of the murder of Bill's foster father, Billy Graham. Evidence at that trial showed that Prince and Smith hired a man to kill Graham to eliminate their $259,000 debt to him and to collect on a $500,000 life insurance policy on Graham. Frederick "Peaches" Andrews testified as to Prince and Smith's involvement in Graham's murder.

Prince and Smith appealed their convictions; Prince remained free on bond during the appeal period. The South Carolina Supreme Court reversed Smith's conviction, but affirmed Prince's. Shortly thereafter,

2

Prince learned he had cancer. He petitioned for rehearing, but the court denied that petition on August 26, 1994. Rather than turning himself in the Monday after the petition for rehearing was denied, Bill Prince left town and remained a fugitive until his capture almost a year later.

Don Prince, Bill's brother, helped Bill evade law enforcement during the year that Bill was a fugitive. Don brought Bill, who was very ill, back to the United States from Puerto Rico, visited Bill, kept in telephone contact with Bill, ran Bill's businesses for him, arranged doctor's appointments for Bill, and found places for Bill to live. When Don's ex-girlfriend learned of Don and Bill's scheme to keep Bill out of jail, Don threatened her to keep her quiet. Don worked with Bill's lawyers on new trial motions and post conviction relief; he attempted to obtain sworn affidavits to assist in these efforts. Don testified at trial, admitting that he assisted Bill in these ways while Bill was a fugitive but explaining that he did so because he loved his brother and wanted to help him during his sickness. Don also testified that he frequently urged Bill to turn himself in.

After state authorities arrested Bill in August 1995, Don, who lived and worked in North Carolina, frequently visited Bill in prison in South Carolina. Don continued managing Bill's affairs and continued to attempt to acquire affidavits in an effort to obtain a new trial for Bill. Don testified to talking to T. Cross, who told Don that he could obtain an affidavit from Peaches Andrews recanting his testimony in the Billy Graham trial. Don had an affidavit prepared and gave it to T. Cross, but Andrews never signed the affidavit. Don also testified to his attempts to obtain an affidavit from Charlie Dorn Smith, who had given an affidavit in 1991 that was helpful to Bill; Don believed that Smith would sign another more detailed affidavit. Don visited Smith and had one of the attorneys and others talk to Smith; Smith, however, did not sign the affidavit. In addition, Don obtained statements from some twenty other witnesses. Various attorneys confirmed that they worked with Don to obtain the affidavits to provide grounds to obtain a new trial for Bill.

In late summer while imprisoned, Bill told Don that he had a friend, a former fellow inmate in state prison, Scott Sherpinskas, who could get the Andrews and Smith affidavits signed. Actually, Sherpin-

3

skas was an FBI informant. After talking with Bill, Sherpinskas contacted Special Agent Rob Waizenhofer telling him that Bill and Don Prince wanted to hire someone to kill Peaches Andrews and Charlie Dorn Smith. According to Sherpinskas, he and Bill Prince began discussing the contract murders of Andrews and Smith in October 1995. Bill wanted to murder Smith because he believed that Smith had orchestrated the lawsuit that Bill's son, Dewitt, had recently filed to obtain control of his father's business. Bill presumably wanted to kill Andrews because of his testimony in Bill's first trial and his subsequent unwillingness to recant. Bill came up with the idea of having Andrews killed, with Dewitt and Smith's murders to follow. After more thought, Bill decided not to kill Dewitt but to have him framed for possessing heroin in hopes of distracting him from pursuing the lawsuit. Bill assured Sherpinskas that his brother Don would travel from North Carolina to pay Sherpinskas's hit man in South Carolina. Bill also told Sherpinskas that his brother Don was going to find someone else to commit the murders if Sherpinskas could not find someone to do it.

As proof of the Princes' murder-for-hire plot, the Government presented another witness, George Thomas Young, who was imprisoned with Bill Prince during the Fall of 1995. (Young did not know of the plot with Sherpinskas and Sherpinskas did not know of the plot with Young.) Young testified that Bill asked him to arrange to murder Andrews and Smith after Young got out of jail on December 1, 1995, in exchange for a pay-off from Don. Bill gave Young maps to Smith's girlfriend's house as well as to Andrews' house and explained that Don would help Young find the houses and would pay Young for the murders. Don acknowledged that Bill introduced him to Young as a "friend," while Young was still imprisoned, but Don disclaimed all knowledge of the two murder plots.

Upon Young's release from prison, Don, after traveling from North to South Carolina, met with Young and showed him the residences of Smith's girlfriend and of Andrews. Don paid Young approximately $2,000 and gave him telephone charge cards to use for calling Don. Don admitted giving the money and telephone cards to Young at his brother's request, explaining that his brother Bill was extremely generous and often told him to distribute or send money to inmate friends. Using the charge cards, Young frequently contacted Don dur-

4

ing Young's first week of release, and Don telephoned Young on at least one occasion. According to Young, he also met with Don to discuss the murder plots on December 7. Young's wife and a neighbor corroborated the fact that Young met with Don and that Young had a map of Smith's girlfriend's house. The evidence showed that Young accurately described the homes of Peaches Andrews and Smith's girlfriend.

On December 8, 1995, Sherpinskas pretended that he had arranged to have a hit man murder Andrews and showed Bill a staged photograph depicting the dead body of Peaches Andrews. Bill negotiated with Sherpinskas as to the amount owing for Andrews's murder and the down payment for Smith's murder. Bill assured Sherpinskas that Don would make the payments to Sherpinskas's chosen hit man. Bill and Sherpinskas came up with the code word "Turbeville" for Don to use so that the hit man would know and recognize Don.

When Don arrived at the prearranged location, a rest stop area off Interstate 20, he asked the hit man (actually undercover FBI Agent Bruce Otterbacher who taped their conversation),"You don't know how to get to Turbeville, do you?" Don and Otterbacher discussed the payoff and Don told him to get rid of the envelopes that contained the $5,000 payoff. Otterbacher asked Don if he had seen the newspaper story reporting the disappearance of Peaches Andrews and Don told him that he had been called earlier that morning about the article. Otterbacher talked about the "first deal" and the "second one." Don told the agent "he wants you to hold off on the second one." The agent replied, "he doesn't want me to do Smith?" Don answered, "no, he wants you to hold on it . . . he wants everything on hold" because "things are buzzing about this." There was a mix-up regarding the payments and the agent asked Don when he could talk to his brother Bill and clear the matter up. Don demurred, explaining, "I don't like to talk a lot to him on the telephone because when he was on the run all my lines were bugged . . . and they still may be."

After Don paid the agent, law enforcement officers arrested him. The police reported that Don then stated in a disgusted voice, "The things you would do for your brother." In the weeks after Don's arrests, the Government obtained search warrants for Don's office,

5

home, boat, and car. The Government introduced at trial several incriminating letters and documents obtained from those searches.

The brothers (mostly Don) lodge numerous arguments as to why their convictions must be reversed.

II.

Both brothers initially object to the district court's refusal to redact a tape recording and transcript of a conversation between Bill and a Government informant in order to omit Bill's use of the word "niggers." They rightly note that this pejorative word had no probative value and was likely to be prejudicial to them.

The Government suggests that the district court offered to allow the defense to use its own version of the transcript, which lacked the epithet. But in fact, the court offered only to allow the admission of the defendant's transcript in addition to the transcript prepared by the Government, which did contain the epithet. As the district court observed, this approach would almost certainly have had the effect of making the epithet more conspicuous, and thus the brothers' refusal to agree to it cannot be considered a rejection of a solution to the problem.

The Government also suggests that redaction is unnecessary in this case because the epithet was isolated, redaction would have delayed the trial, and the defense had failed to seek redaction before trial even though it had access to the tape for several weeks. The primary reason the defense failed to request redaction earlier, however, appears to be that its transcript of the tape never included the word. Although at trial the Government asserted that redaction would take "all afternoon," that statement seems to have been based primarily on its concern that new transcripts would have to be made, and the district court indicated that new transcripts could be made quickly and easily. Accordingly, we find the Government's argument that the epithet was properly admitted because redaction would have caused unjustifiable delay unpersuasive.

However, we believe that the error in failing to redact the statement was harmless because of the district court's careful jury instruction.

6

"We generally presume that a jury will follow cautionary instructions regarding potentially prejudicial evidence." <u>United States v. Love</u>, 134 F.3d 595, 603 (4th Cir. 1998). The district court instructed the jury not to allow the offensive language in the tape influence its conclusions. This instruction was sufficient to eliminate the relatively modest prejudicial effect that this isolated epithet might otherwise have had on the jury.

III.

While in prison, Bill sent a letter to his wife, which contains the following passage:

> Please keep me posted on Pam [Don's daughter] and Scott's kids. I sure hope Jillian will be well soon. I know they are really hurt with everything that is going on. But I hope they will understand that everything is my fault. I will never be able to forgive myself for the problems that I have caused everybody. <u>But if it would be any consolation, I would have done the same for Don</u>.

(Emphasis added). The district court concluded that this letter constituted proper admissible evidence against Bill, but not against Don. Neither of those rulings is challenged on appeal.

What Don does challenge is the district court's refusal to sever his trial from Bill's. Don contends that the emphasized sentence in the letter facially and powerfully incriminates him. For this reason, he asserts that its admission at their joint trial violates the rule established in <u>Bruton v. United States</u>, 391 U.S. 123 (1968). In <u>Bruton</u>, the Supreme Court held that admission at a defendant's trial of the confession of a non-testifying co-defendant, which is "powerfully incriminating" of the defendant, violates the defendant's Sixth Amendment right to confront adverse witnesses. <u>Id.</u> at 135. A cautionary instruction by the trial court cannot cure such a violation and if such evidence is to be admitted against the co-defendant, severance of the defendants' trials is necessary. <u>Id.</u>

Subsequently, in <u>Richardson v. Marsh</u>, 481 U.S. 200 (1987), however, the Court clarified that a jury instruction can prevent or cure a

7

Sixth Amendment violation where the proffered statement does not expressly implicate the defendant, but only becomes incriminating by virtue of an inference from other evidence. The Court explained:

> Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence. Specific testimony that "the defendant helped me commit the crime" is more vivid than inferential incrimination, and hence more difficult to thrust out of mind. Moreover, with regard to such an explicit statement the only issue is, plain and simply, whether the jury can possibly be expected to forget it in assessing the defendant's guilt; whereas with regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget.

Id. at 208.

The Richardson Court emphasized that the statement at issue there omitted all reference to the existence of the defendant; of course, here, the challenged statement does expressly name Don. Moreover, the Richardson Court rationalized its distinction between "facially incriminating" statements and statements "requiring linkage" by noting that a rule limiting the application of Bruton to the former could be "complied with by redaction -- a possibility suggested in that opinion itself." Id. at 208-09. Here, redaction of the last sentence would have entirely remedied the problem; however, neither the parties nor the district judge considered redaction. They only discussed exclusion of the entire letter, severing Don's trial from Bill's, or admission of the letter with an instruction that the jury was only to consider it as evidence against Bill. (Don rejected the instruction.)

Thus, the case at hand differs from Richardson . However, Don cannot prevail based on these distinctions because Bruton does not mandate severance unless evidence "powerfully incriminates" a defendant. In Bruton, the co-defendant directly inculpated the petitioner by stating essentially that "we committed the crime." Here, on the other hand, the challenged passage does not powerfully incriminate Don.

8

To be sure, in light of the evidence presented in this case, a juror could conclude that "the same" Bill would have done for Don referred to the crime charged against Don -- conspiring to murder the witnesses against his brother. Even if all evidence of Don's aid to Bill while Bill was a fugitive was excluded, see infra at 11-12, the Government presented abundant evidence that while Bill was imprisoned, Don visited and telephoned Bill frequently, ran his businesses, and worked feverishly to obtain the affidavits believed necessary for Bill's new trial. Indeed, Don testified at trial and freely admitted to the considerable efforts he made on his brother's behalf.

If Don was, as he claimed, not guilty of the crime charged, Bill might well have especially regretted and so particularly apologized to the family for the fact that Don's innocent assistance to him could be used as circumstantial evidence tying Don to Bill's criminal conspiracy. The statement in Bill's letter is not in any way inconsistent with Don's defense that he extensively assisted his brother but never participated in any murder-for-hire plot. The statement, standing alone, simply does not powerfully incriminate Don.

IV.

Don also challenges the search warrants used by the Government to search his car, home, boat, and office. He contends that the warrants were supported by false information, were not based on probable cause, and were overbroad.

We have carefully examined the affidavits and warrants. We have no difficulty concluding that the affidavits contained no information known by the officers to be materially false. Similarly, those affidavits provide ample probable cause to justify issuance of the warrants.

Some portions of the warrants do, however, contain broad boilerplate language authorizing seizure of every conceivable item without tying these items to the alleged crimes or circumstances of the case. However, the first two categories of "items to be seized" listed in the warrant are specifically identified, i.e."life insurance policies, business transactions, and/or communications involving" Bill, Don, and their allegedly intended victims, and documents"evidencing the fraudulent or illegal acquisition of life insurance policies or the pro-

9

ceeds thereof." These two categories are certainly described with adequate particularity. See United States v. Fawole , 785 F.2d 1141, 1144 (4th Cir. 1986).

We have held that, in order to avoid the suppression of lawfully seized evidence, a warrant that properly identifies some items "will not be defeated by [other] ambiguous or conclusionary language" so long as the warrant was "sufficiently particularized with respect to the items seized." United States v. Jacob, 657 F.2d 49, 52 (4th Cir. 1981). In other words a court will "sever" the too general portion of the warrant from the sufficiently specific portion. See United States v. George, 975 F.2d 72, 79 (2d Cir. 1992). A search "conducted pursuant to a warrant held unconstitutional in part does not invalidate the entire search [and] only those items seized beyond the warrant's scope will be suppressed." Id. ("`the remedy with respect to any items exceeding the scope of the warrant [is not] invalidation of the search but suppression of those items.'") (quoting United States v. Dunaloy, 584 F.2d 6, 11 n.4 (2d Cir. 1978)).

Don has pointed to no evidence used by the Government at trial that did not fall into the properly identified first two categories of the warrant. The evidence obtained pursuant to the lawful portion of the warrant was rightly admitted, the remainder of the warrant, while too broad, provides no basis for reversal.

V.

Don maintains that the district court erred in admitting, over his objection, evidence of Bill's prior murder conviction; evidence that Bill was a beneficiary of the insurance policies held by the victim of that murder, Billy Graham, and by one of the intended victims of the instant murder-for-hire scheme; evidence that Don helped Bill collect on Graham's policy; evidence that Don helped Bill when he was a fugitive; evidence, including the complaint, of a lawsuit brought against Don by his nephew; and evidence of threats allegedly made by Don against a woman who later testified at trial for the Government. Don asserts that the admission of this evidence violated Federal Rule of Evidence 404(b), in that it simply constituted evidence of bad character with no other legitimate evidentiary purpose, and Rule 403, in that its prejudicial effect outweighed its probative value.

10

Rule 404(b) permits admission of evidence necessary to prove "motive, opportunity, preparation, plan, knowledge, identity or absence of mistake or accident." United States v. Bailey, 990 F.2d 119, 122 (4th Cir. 1993). Also admissible is evidence of bad acts that arise out of the same series of transactions as the charged offense and is "necessary to complete the story of the crime," United States v. Kennedy, 32 F.3d 876, 885 (4th Cir. 1994), evidence inextricably intertwined with the charged crime, United States v. Chin, 83 F.3d 83, 88 (4th Cir. 1996), or evidence "elicited as part of the groundwork that the government needed to lay to explain to the jury how . . . individuals fit into the operation of [a] conspiracy," United States v. McMillon, 14 F.3d 948, 955 (4th Cir. 1994). It is well established that evidence of these kinds does not implicate Rule 404(b)'s prohibition of evidence admitted solely to demonstrate bad character. See Kennedy, 32 F.3d at 886; Chin, 83 F.3d at 88; McMillon, 14 F.3d at 955.

We fail to see what bearing Bill's murder conviction and his status as a beneficiary of the insurance policies would have on the matter of Don's character, and thus we doubt that this evidence even raises a question under Rule 404(b). The evidence concerning Bill and the insurance policies certainly has no such significance in itself. Assuming that Bill's prior murder conviction could have subjected Don to inferences of guilt or bad character by association, that evidence was plainly admissible as evidence necessary to complete the story of the crime. See Kennedy, 32 F.3d at 885. Similarly, the evidence concerning the lawsuit was properly admitted to illustrate Don's motive and intent to kill Smith. Likewise, Don's threatening statements to his ex-girlfriend was evidence of his intent, preparation, plan, and absence of any mistake. Nor did any of this evidence unfairly prejudice Don.

The evidence that Don helped Bill collect on the Graham policy and that Don helped Bill while he was a fugitive, by contrast, should have been excluded. This evidence could have been omitted without adversely affecting a complete presentation of the story of the crime alleged against Don, i.e., conspiracy to murder the witnesses. The assistance Don gave Bill when he was a fugitive manifestly was not part of the same criminal episode as the conspiracy to murder the witnesses; the "criminal episode" surrounding Bill's flight from justice terminated when Bill was captured, and there is nothing to indicate

11

that Bill planned to murder the witnesses before then. Thus, evidence of Don's assistance to Bill while he was a fugitive was not admissible as evidence of acts constituting "necessary preliminaries" to the conspiracy, acts "inextricably intertwined" with it, acts forming part of a single criminal episode containing the alleged crime, Chin, 83 F.3d at 88, or acts arising out of the same series of transactions, Kennedy, 32 F.3d at 885.

It is difficult to see what probative value this evidence could have had other than to suggest that Don had previously been involved in Bill's unlawful activity, and that Don was therefore likely to have conspired with his brother in the charged conspiracy. The only justifications that the Government offers for this evidence are that it "allowed the jury to fully understand the extent of the conspiracy and the illegal methods used by him and Bill in reaching the goal of their conspiracy," and that it "shows how the Prince brothers established a relationship of trust through their activities and how these events flowered into the charged crimes." Brief of Appellant at 33. The former assertion falsely implies that the prior bad acts were part of the conspiracy alleged, and the latter in effect creates a new exception to Rule 404(b) that would allow a defendant's prior bad acts in conjunction with a co-defendant, whatever their nature, to be admitted in virtually every instance.

In sum, even if this evidence could survive scrutiny under Rule 404(b), it would nonetheless be inadmissible under Rule 403 because its prejudicial effect would outweigh whatever modest probative value it might have. However, even where the trial court abuses its discretion in admitting bad character evidence, such error may be harmless. See United States v. Kenny, 973 F.2d 339, 344 (4th Cir. 1992). In deciding the harmlessness of an error we must determine "whether we can say that we believe that it is `highly probable that the error did not affect the judgment.'" United States v. Madden, 38 F.3d 747, 753 (4th Cir. 1994) (quoting United States v. Nyman, 649 F.2d 208, 212 (4th Cir. 1980)). In light of the voluminous properly admitted evidence detailed above against Don, we have no difficulty finding that the error here did not affect the judgment and was therefore harmless.

12

VI.

Don asserts that the district court erred by instructing the jury that "[i]t does not matter whether the interstate travel took place before or after the murder occurred or was supposed to have occurred," because the statute criminalizes interstate travel with an intent that murder "be committed," not interstate travel following a murder.

Don maintains that the meeting in which he gave money to the Government agent occurred after the victim to whom the payment allegedly related, Peaches Andrews, was already believed to be dead. Even if the Government cannot rely on evidence of travel post-murder, a question we need not decide here, this does not assist Don in light of the fact that the Government produced evidence tending to show that Don traveled interstate to further the plan to murder Andrews before he came to believe Andrews was dead. The evidence indicated, for example, that Don could not have believed Andrews was dead prior to December 8, and that Don drove from North to South Carolina on December 1 to meet with an individual concerning Andrews's murder.

VII.

We have carefully reviewed Don's other arguments as to why his conviction must be reversed and find them all meritless. There remains only Don's assertion that the district court improperly enhanced his sentence for obstruction of justice under U.S.S.G. § 3C1.1.

On appeal, Don essentially contends that there was insufficient evidence for the district court to find that he gave false testimony when he took the stand. The district judge made a finding at the sentencing hearing that Don had lied at trial when he testified that the money he gave to the hit man was paid for the purpose of obtaining affidavits to help secure a new trial for Bill. The district court relied heavily on the audio tape of the meeting at the interstate rest area between Don and Agent Otterbacher. Though the court noted that"the parties [on the tape] used guarded language and code words," it also noted that "[i]t was obvious they were talking about something that was some-what nefarious" and that there was no reference on the tape to any sort

13

of affidavit. Indeed, the tape contains interchanges between Don and the undercover agent that seem surely related to the plot to murder Peaches Andrews and Smith, not to affidavits. For instance, when Otterbacher complained about the amount of money Don had brought, the following exchange took place:

> Otterbacher: I was supposed to get five thousand for the first deal, okay. That was up front and I was supposed to get five thousand more cut in half and you guys were gonna hold on to half of it for the second one.

> Don: Yeah, but [Bill] wants you to hold off on the second one.

> Otterbacher: Oh, he doesn't want me to do Smith?

> Don: No, no, no, no, no he [Bill] wants to hold on it.

> Otterbacher: I thought he wanted him done in a couple days.

> Don: No, no, no, no, he wants you to hold him. He wants you to hold on him . . . .

The discussion on the tape in conjunction with the trial testimony of Sherpinskas, who arranged the meeting, convince us that the district court did not commit clear error when it found that Don had lied on the stand about this meeting. Thus there was sufficient evidence to support the district court's obstruction of justice enhancement.

In his reply brief, Don additionally contends that the sentencing judge failed to follow the requirements of United States v. Dunnigan, 507 U.S. 87 (1993). Dunnigan directs that in order to impose an enhancement for obstruction of justice, a court must make a "finding . . . of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury." Id. at 95. The "factual predicates" consist of at least the main elements of the Court's definition of perjury: falsity, materiality, and intent. See id. at 94. Don contends that in this case the district court found only that Don committed "perjury," and made no specific findings on two of the factual predicates, namely intent to testify falsely and materiality.

14

Whether the district court's finding was sufficient under <u>Dunnigan</u> presents a close question. However, this circuit has long held that we will not address new arguments raised for the first time in the reply brief. <u>See Hunt v. Nuth</u>, 57 F.3d 1327, 1338 (4th Cir. 1995). Don has thus waived his <u>Dunnigan</u> argument; the obstruction of justice enhancement was not otherwise in error.

<u>AFFIRMED</u>

15