Vacated by Supreme Court, January 24, 2005

**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

FRANTZ MICHEL, a/k/a Freon, a/k/a John Doe,

*Defendant-Appellant.*

No. 03-4204

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Henry E. Hudson, District Judge.
(CR-00-141)

Argued: January 20, 2004

Decided: February 26, 2004

Before WIDENER, WILLIAMS, and MOTZ, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**COUNSEL**

**ARGUED:** Michael Morchower, MORCHOWER, LUXTON & WHALEY, Richmond, Virginia, for Appellant. Amy Eileen Pope, Special Assistant United States Attorney, Richmond, Virginia, for Appellee. **ON BRIEF:** Paul J. McNulty, United States Attorney, Richmond, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

## OPINION

PER CURIAM:

Frantz Michel appeals his conviction and sentence for drug traf-
ficking conspiracy, in violation of 21 U.S.C.A. § 846 (West 1999).
After a jury trial, Michel was convicted and sentenced to life impris-
onment. Michel alleges errors during both the guilt and sentencing
phases of his trial. For the reasons that follow, we affirm the district
court.

### I.

Viewing the evidence in the light most favorable to the Govern-
ment, as we must in light of the verdict, *see United States v. Burgos*,
94 F.3d 849, 854 (4th Cir. 1996), the evidence at Michel's trial estab-
lished the following facts. Michel lived in Brooklyn, New York, and
coordinated cocaine, crack cocaine, and heroin distribution in Vir-
ginia through associates in Richmond, Virginia. The conspiracy
indictment against Michel arose out of a joint DEA and Richmond
Police Department investigation that began in 1999, with the arrest of
Charles Dandrich, who agreed to cooperate with law enforcement and
to expose the conspiracy. The conspiracy involved, in addition to
Michel, the following individuals who testified against Michel at his
trial: Dandrich, Rasheed Williams, Kevin Levy, Gerarod Harvell,
Alando Brown, Girrard Ampy and Jeffrey Titus. The conspiracy
involved Michel using couriers to transport cocaine and heroin from
New York to Kevin Levy in Richmond. Levy would then cook some
of the cocaine into crack cocaine and sell the heroin, powder cocaine,
and crack cocaine on the street through various street dealers. After
the drugs were sold, Levy would arrange to transport the proceeds of
the drug sales back to Michel in New York.

On April 18, 2000, a grand jury returned an eighteen-count indict-
ment against eight of the co-conspirators. Count I of the indictment,

the only count relevant here, alleged that between 1997 and March 2000, the conspirators, including one named "JOHN DOE, a/k/a 'Freon,'" conspired to violate 21 U.S.C.A. § 841(a) (West 1999) by possessing with intent to distribute and distributing heroin, cocaine, and more than 50 grams of cocaine base ("crack"). (J.A. at 47.) "JOHN DOE, a/k/a 'Freon'" was later identified as Michel. Michel pleaded not guilty and was tried before a jury. Following a three-day trial, the jury returned a verdict of guilty on Count I. At sentencing, the district court imposed a four-level enhancement for Michel's role as an organizer or leader of the conspiracy, pursuant to *U.S. Sentencing Guidelines Manual* § 3B1.1(a) (2003). Michel timely filed an appeal. Michel alleges six different errors during his trial, and also argues that the U.S.S.G. § 3B1.1 sentencing enhancement was in error. We address each of Michel's arguments in turn.

## II.

### A.

Michel first argues that the district court erred in allowing Charles Dandrich and Girrard Ampy to testify regarding events that took place before 1997, the beginning date of the conspiracy as charged in the indictment. Michel argues that this testimony was evidence of "other crimes, wrongs, or acts" that is generally inadmissible under Fed. R. Evid. 404(b) (West 2001). Before trial, the district court issued a discovery order that provided that "[b]y the close of business three days prior to trial, (1) the United States shall provide notice to the defendant, in accordance with Rule 404(b), of the general nature of any evidence of other crimes, wrongs, or acts that it intends to introduce at trial." (J.A. at 59.) The Friday before the Monday that trial began (*i.e.*, one business day before trial), the Government provided notice that it intended to introduce testimony from Dandrich and Ampy that they conspired with Michel to distribute drugs as far back as 1991. Michel argues that the Government's notice was late and that the district court erred in denying his motion to exclude this evidence.

We review the district court's decision to admit the evidence for an abuse of discretion. *See United States v. Jackson*, 327 F.3d 273, 298 (4th Cir. 2003). The testimony of Ampy and Dandrich regarding drug deals between Ampy, Dandrich, Levy and Michel was not evidence

of "other crimes" covered by Rule 404(b). Like the challenged testi-mony in *United States v. Kennedy*, 32 F.3d 876 (4th Cir. 1994), the testimony of Ampy and Dandrich "provid[ed] the jury with back-ground information" on Michel's "activities during the preparatory stages of the conspiracy" and "served to complete the story of the crime on trial." *Kennedy*, 32 F.3d at 886 (internal quotation marks omitted); *see id.* at 885-86 ("Kennedy's argument erroneously assumes that all evidence falling outside the charged conspiracy period necessarily involves a separate, unrelated offense subject to the strictures of [Rule 404(b)]."). Accordingly, because Dandrich and Ampy's testimony was not Rule 404(b) evidence, the Government's Friday notice of its intent to offer the testimony did not violate the requirement in the discovery order that Rule 404(b) evidence be dis-closed at least three days before the beginning of trial.[1] Because the testimony was relevant to Michel's participation in the conspiracy, the district court was well within its discretion in admitting the testimony.

## B.

Next, Michel contends that the Government used its peremptory strikes in a racially discriminatory manner in contravention of *Batson v. Kentucky*, 476 U.S. 79 (1986). During jury selection, the Govern-ment used two of its four peremptory strikes against African-American venirepersons. After the jury was selected, Michel raised a *Batson* challenge. The district court then required the Government to offer a neutral explanation for the strikes. The Government explained

---

[1]The Government argues in the alternative that even if the testimony of Ampy and Dandrich was Rule 404(b) evidence, the discovery order required disclosure only "three days" before trial and that disclosure on Friday for a Monday trial satisfies this requirement. Federal Rule of Criminal Procedure 45 clearly provides that "in computing any period of time specified in . . . *any* court order . . . [e]xclude intermediate Satur-days, Sundays, and legal holidays when the period is less than 11 days." Fed. R. Crim. P. 45(a)(2) (West Supp. 2003) (emphasis added). Because we conclude that the testimony was not Rule 404(b) evidence, it was not covered by the Rule 404(b) disclosure requirement in the discovery order. Accordingly, we assume without deciding that disclosure of Rule 404(b) evidence on Friday for a Monday trial would have been late dis-closure. At oral argument, the parties indicated that this language in the district court's routine discovery order has been subsequently clarified.

that one venireperson was struck because she "is presently married to a lawyer who does defense work . . . [and] she's a retired teacher." (J.A. at 82.) The other venireperson was struck because "he's a custodian at the schools. And . . . there are perhaps better Government jurors in the panel." (J.A. at 82.) The district court then found that "[b]ased upon the current proportion of the jury, the pattern of the strikes exercised, and the race-neutral explanation given by the Government," the Government was not exercising its strikes in a racially discriminatory manner and denied Michel's motion. (J.A. at 83.)

Generally, a *Batson* challenge consists of three steps: (1) the defendant makes a prima facie case; (2) the Government offers a race-neutral explanation; and (3) the trial court decides whether the defendant has carried his burden and proved purposeful discrimination. *United States v. Barnette*, 211 F.3d 803, 812 (4th Cir. 2000). "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991). Accordingly, we turn directly to the second step in the *Batson* inquiry.

The second step requires the Government to proffer a race-neutral explanation for its strikes. "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 360. The Government's proffered explanations clearly satisfy this second step.

Turning to the third step in the inquiry, we review only for clear error the trial court's finding that Michel failed to carry his burden to prove purposeful discrimination. *Jones v. Plaster*, 57 F.3d 417, 421 (4th Cir. 1995). Michel offered no circumstantial evidence of racial motivation other than the raw statistics that the Government used two of its four strikes on African-Americans and that the venire as a whole was approximately 20 percent African-American. Based on the record in this case, the district court did not clearly err in denying Michel's *Batson* motion.

C.

Third, Michel argues that the Government improperly referred to the guilty pleas of testifying co-defendants in its opening statement. After describing the evidence that the jury would hear, the prosecutor stated, "All of these individuals that I have mentioned, Kevin Levy, Rasheed Williams, Ike Titus, Gerarod Harvell, and Alando Brown, they have all pled guilty as being a member of this organization." (J.A. at 110-11.) All of these individuals testified at Michel's trial. Michel did not raise this issue below,[2] so we review only for plain error. *United States v. Cherry*, 330 F.3d 658, 665 (4th Cir. 2003).

We previously have held that, even assuming there is any error in discussing the guilty pleas of testifying co-defendants, such error is harmless if there is a limiting instruction. *United States v. Blevins*, 960 F.2d 1252, 1260-61 n.3 (4th Cir. 1992). In this case, the district court gave the following limiting instruction: "Testimony or reference to guilty pleas or convictions of other alleged co-conspirators should not be considered by the jury as substantive evidence of the guilt of the Defendant, Frantz Michel." (J.A. at 709.) Accordingly, even assuming that the reference to the guilty pleas of testifying co-defendants was error, the error was harmless, and thus, was not plain.

D.

Fourth, Michel argues that the district court abused its discretion in admitting evidence of firearms and drugs seized during searches of residences of co-conspirators. This argument is wholly without merit. It is basic conspiracy law that a defendant "is liable for the conduct of all co-conspirators that was in furtherance of the conspiracy and reasonably foreseeable to him." *United States v. Newsome*, 322 F.3d 328, 338 (4th Cir. 2003). Firearms, and certainly the drugs them-

---

[2]Before the district court, Michel raised a challenge to the Government's reference to *non-testifying* co-defendants. In his brief on appeal, however, Michel argues only that the statement about the *testifying* co-defendants was improper. (Appellant's Br. at 22 ("Although these individuals testified in this case, the opening statement of the United States violated [*United States v. Blevins*, 960 F.2d 1252 (4th Cir. 1992)] and unfairly prejudiced the defendant.").)

selves, are reasonably foreseeable to a defendant involved in a drug conspiracy. *See, e.g.*, *United States v. Cummings*, 937 F.2d 941, 945 (4th Cir. 1991) (adopting Seventh Circuit's observation in *United States v. Diaz*, 864 F.2d 544, 549 (7th Cir. 1988) that "[w]hen an individual conspires to take part in a street transaction involving a kilogram of cocaine worth $39,000, it certainly is quite reasonable to assume that a weapon of some kind would be carried."). The evidence seized at the homes of co-conspirators was probative because it was part of the conspiracy for which Michel was charged, and the district court did not abuse its discretion in admitting the evidence.

E.

Michel next contends that the district court abused its discretion in allowing the Government to question witness Kevin Levy about his contacts with Mr. Wagner, Michel's trial counsel. On the morning of the second day of trial, the Government brought to the attention of the district court the fact that Michel's counsel had had personal contact with Levy, a witness for the United States who was represented by counsel, without first obtaining permission from Levy's attorney. Michel's trial counsel stated that Levy waived his right to counsel and agreed to speak to him. In light of this contact, the Government asked for "considerable latitude" in its direct examination of Levy. (J.A. at 368.) The district court held that it would "allow [the Government] to ask questions, whatever questions pertaining to that interview you feel are appropriate. I will entertain [Michel's] objection on a question-and-answer basis. . . . I don't find anything inappropriate" in Michel's trial counsel's conduct. (J.A. at 370.) During direct examination, the Government asked Levy the following questions regarding his contact with Michel's trial counsel: (1) "Now, prior to testifying here today, did you get a visit from Mr. Wagner?"; (2) "And during that visit, did he speak with you about the law?"; (3) "Did he tell you — did he ask you whether his — or did he tell you whether he had been given permission by your lawyer to speak with you?"; (4) "Did you ask to speak with Mr. Wagner, or did Mr. Wagner come and visit you?"; and (5) "Did you request Mr. Wagner to come visit you?" (J.A. at 407-09.) In addition to his overall objection, Michel specifically objected both to Question 2 and Levy's answer to Question 2. The district court overruled the objections.

Although the Government claims that these questions were asked solely to elicit Levy's potential bias in testifying, we doubt whether this line of questioning was appropriate to show Levy's bias, especially when the Government was not attempting to discredit Levy, and Levy's plea agreement sufficiently established any potential bias for or against Michel in Levy's testimony. Assuming that it was error to permit this line of questioning, however, we find that any error was harmless.

"The proper test of harmlessness of nonconstitutional error is whether we, in appellate review, can say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *United States v. Urbanik*, 801 F.2d 692, 698 (4th Cir. 1986) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). In applying this test, the error is harmless if it is "highly probable that the error did not affect the judgment." *Id.* at 699 (quotation marks omitted). "In assessing whether it is 'highly probable' that the error did not 'affect' or 'substantially sway' a judgment of conviction, we must consider three factors: (1) the centrality of the issue affected by the error; (2) the steps taken to mitigate the effects of the error; and (3) the closeness of the case." *United States v. Ince*, 21 F.3d 576, 583 (4th Cir. 1994). Here, the assumed error involved questions about the conduct of Michel's counsel, an issue far from central to the case. Moreover, this was not a close case as there was overwhelming evidence of Michel's guilt. Accordingly, it is highly probable that any error did not affect the judgment, and thus, the error was harmless.

F.

In the final assignment of error related to his conviction, Michel argues that there is insufficient evidence that he was a member of the conspiracy to support the jury's verdict. As to the quantum of evidence necessary to sustain a criminal conviction, we have held that

> a jury verdict *must be sustained* if there is substantial evidence, taking the view most favorable to the Government, to support it. A reviewing court, therefore, may not overturn a substantially supported verdict merely because it finds the verdict unpalatable or determines that another, reasonable

verdict would be preferable. Rather, we shall reverse a verdict if the record demonstrates a lack of evidence from which a jury could find guilt beyond a reasonable doubt.

*Burgos*, 94 F.3d at 862 (internal quotation marks and citation omitted). To prove a conspiracy to possess drugs with the intent to distribute, the Government must establish that: (1) an agreement to possess drugs with the intent to distribute existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy. *Id.* at 857.

Michel argues that the evidence shows merely a buyer-seller relationship between himself and Levy. To the contrary, every co-conspirator that testified linked Michel to the plan to sell drugs in the Richmond area. The evidence shows that Michel collected money from the drug sellers and directed couriers to transport the drugs to Levy. Levy specifically testified that he "never bought drugs from [Michel]" and denied that he was "bringing drugs from New York" or that he was "having drugs brought from New York." (J.A. at 376, 410-11.) Levy testified instead that Michel would supply him with drugs to sell and that Levy was "receiving drugs in Richmond." (J.A. at 411.) Levy further testified that when a courier disappeared with $70,000 of drug proceeds, Michel split the loss with Levy instead of requiring Levy to absorb the entire loss himself. Given this testimony, there was substantial evidence to support the jury's conspiracy verdict.

Having rejected all of Michel's arguments related to his conviction, we affirm Michel's conviction for conspiracy to possess with intent to distribute and conspiracy to distribute heroin, cocaine, and more than 50 grams of cocaine base.

## G.

Finally, we address Michel's argument that the district court erred in enhancing his sentence pursuant to U.S.S.G. § 3B1.1 (2003). Section 3B1.1 provides for an enhancement to a sentence based on a defendant's role as an organizer or leader of the criminal activity.

"We review role in the offense adjustments for clear error." *United States v. Perkins*, 108 F.3d 512, 518 (4th Cir. 1997).

The Presentence Report recommended a four-level enhancement for Michel's role as an organizer in the offense. Michel objected to this recommendation, essentially reiterating his argument that the evidence showed that he was merely in a buyer-seller relationship with Levy. It is true, as Michel argues, that we have held that "being a buyer and seller of illegal drugs . . . does not establish that a defendant has functioned as an 'organizer, leader, manager or supervisor' of criminal activity" as required by U.S.S.G. § 3B1.1. *United States v. Sayles*, 296 F.3d 219, 225 (4th Cir. 2002). The district court, however, rejected Michel's argument that he was merely a seller of drugs, finding that

> the evidence demonstrated that Mr. Michel . . . stood at the apex of a major drug distribution syndicate, a syndicate which shipped substantial quantities of cocaine hydrochloride from the state of New York to the state of Virginia for street-level distribution.
>
> It was Mr. Michel that organized and supervised couriers. He was the one that determined when the drugs were going to be shipped down here. He was also the one that supervised the return of the money from Virginia back to New York. And in fact, he was personally present in Virginia at the time in which I think $35,000, somewhere around that amount of money, was being returned to the state of New York.
>
> So I think the evidence demonstrates that Mr. Michel is more than just a supplier. He is someone who has an organizational role in leading an extensive drug distribution syndicate.
>
> The evidence indicated, as I mentioned, that he would send couriers to Virginia with shipments of drugs and that he would direct them to return with the money. By virtue of his pivotal role, he controlled the timing of drug distribution

and the quantities of shipments, the profits, and the types of drugs that were on the street.

The Court also finds there w[ere] at least five other participants in this conspiracy. . . . So based upon the number of participants, the duration of the conspiracy, the quantity of drugs involved, the revenue generated, the geographic span, and the control that Mr. Michel exerted by virtue of being the faucet, so to speak, that controlled the flow of drugs from New York to Virginia, and his control of the individuals on the street, the profits they made, all made him an organizer.

(J.A. at 797-98.) After reviewing all of the evidence, we conclude that the district court's finding that Michel stood at the apex of this conspiracy is not clearly erroneous. Accordingly, we affirm the district court's imposition of the four-level enhancement pursuant to U.S.S.G. § 3B1.1.

### III.

For the foregoing reasons, we affirm Michel's conviction and sentence for drug trafficking conspiracy.

*AFFIRMED*