**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 08-5204**

─────────────

UNITED STATES OF AMERICA,

           Plaintiff - Appellee,

    v.

GARY LYNN TOLIVER, JR., a/k/a BG, a/k/a Lil Gary, a/k/a
Garry Toliver, Jr.,

           Defendant - Appellant.

─────────────

**No. 08-5217**

─────────────

UNITED STATES OF AMERICA,

           Plaintiff - Appellee,

    v.

MIKAL MUSTAFA MIX, a/k/a Stash, a/k/a Dirty Boy, a/k/a
Mikail Mix, a/k/a Man Man,

           Defendant - Appellant.

─────────────

Appeals from the United States District Court for the Eastern
District of Virginia, at Norfolk. Jerome B. Friedman, District
Judge. (2:08-cr-00022-JBF-JEB-3; 2:08-cr-00022-JBF-JEB-2)

─────────────

Argued: May 14, 2010         Decided: July 13, 2010
       Amended: November 12, 2019

─────────────

Before GREGORY, AGEE, and DAVIS, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**ARGUED:** Rebecca Sue Colaw, REBECCA S. COLAW, PC, Suffolk, Virginia; Lawrence H. Woodward, Jr., SHUTTLEWORTH, RULOFF, SWAIN, HADDAD & MORECOCK, PC, Virginia Beach, Virginia, for Appellants. Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** Dana J. Boente, United States Attorney, Alexandria, Virginia, William D. Muhr, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Gary Toliver ("Toliver") and Mikal Mix ("Mix") appeal their convictions for racketeering and various violent crime, gun, and drug distribution offenses connected to gang activity by the Bounty Hunter Bloods ("BHB") in Norfolk, Virginia. On appeal, they raise, both jointly and individually, a number of claims concerning their trial. For the reasons that follow, we affirm both Toliver and Mix's convictions in their entirety.

I.

This case concerns Toliver's and Mix's participation in the BHB gang in Norfolk, Virginia. The evidence presented at trial described both the overall structure of the gang and specific instances of violent conduct or drug and gun distribution activity involving the defendants.

A.

The BHB was established in Norfolk in the early 1990s by an Original Gangster of the BHB in New York, Cody. The BHB has a formal hierarchical command and authority structure with defined roles. The BHB controlled several neighborhoods of Norfolk, and each was called a "chapter."[1] Each chapter was led by a

---

[1] Norview was chapter 1; Coleman Place was chapter 2; Little Creek was chapter 3; Ballentine was chapter 4; Poplar Hall was chapter 5, and University Apartments was chapter 7.

different BHB member called a general. The general controlled all BHB activity in his chapter. Each general, in turn, had other members working underneath him in his chapter called young gangsters ("YG") or little homies.

Both Mix and Toliver had prominent roles in the BHB. Mix, also known as Stash, Man Man, or Dirty Boy, was one of the founding members of the gang from Mount Vernon, New York and was the general of the Ocean View area of Norfolk. Toliver, also known as BG, was the general of Norview. Antonio Fulford, a codefendant who pleaded guilty and testified for the prosecution, was the general of Little Creek. Another cooperating coconspirator, hereinafter referred to as "John Doe" or "Doe," was the leader of the BHB overall, and all of the generals, including Mix and Toliver, reported to him.

Individuals can become members of the BHB in three ways. The most common way is to "shoot a 31" whereby the person looking to join stands in the middle of five BHB members in a five-pointed star formation. The current members then beat the inductee for thirty-one seconds. Individuals can also be blessed in by current members of the gang. Finally, women, called rubies, can be "sexed in," by having sexual intercourse with five members of the gang. John Doe estimated that at the time he was arrested along with Mix and Toliver, the BHB had

4

between 300 and 400 members, mostly teenagers but with some members as young as nine.

Members of the gang from all chapters would meet every two to three months. During these meetings, the generals would report what was happening in their chapter, violations of gang rules would be cured by having the offending member shoot a 31, and members would be encouraged to "represent their flag" by letting others know they were part of the BHB. Toliver led most of these larger meetings, and Mix would also participate.

Within each chapter, the members of the BHB made money through home invasions, robberies, and sales of narcotics. Additionally, members were expected to "put in work," to do an act of violence, such as a robbery or shooting, to represent the BHB. Rubies often put in work by attracting a robbery victim and leading him to a group of waiting gang members. If a YG or little homie refused to put in work, they would be disciplined by having to shoot a 31 again. If members seriously dishonored the gang, they could be killed.

The BHB has its own language and lingo that members use between themselves. For example, members avoid using words that begin with the letter "C" and instead change it to a "B" because the letter "C" is associated with the Crips, a rival gang. The BHB greet each other with the phrase "what's poppin" or with the call "blllaat." Additionally, members are required to learn

5

oaths to be sworn to the gang. Generals would test YGs or little homies on their knowledge of the gang by walking up to them and "G Checking" them, asking them a question about gang protocol, which also served to make sure that someone was not "false flagging" and pretending to be a member of the gang. The BHB's symbol is a five-pointed star. Each point on the star has a meaning: body, unity, love, lust, and soul. The BHB wear red as an identifying color and put a red bandana in their right back pocket. They use hand symbols such as "ck," meaning Crip killer, and a five-pointed star. All of these identifying characteristics serve to brand the gang, both within its membership and to rival gangs and the public.

B.

In addition to being part of the overall command structure of the BHB, Toliver and Mix were involved in several violent incidents perpetrated by BHB members between March 2004 and November 2007.

1.

On March 5, 2004, a dance for teenagers was held at the VFW in Ocean View. Many members of the BHB and Crips attended. Tension between the gang members rose during the dance, so the attendees were sent outside by the organizers, and the dance ended. Once outside, a fight started, and a member of the BHB called Mix and told him to bring guns to the VFW. Mix then

6

drove to the VFW and passed out four or five guns to the BHB members who were there.  They started shooting into the crowd and one girl, who was uninvolved in the fight, was grazed in the head, requiring emergency care.

2.

On May 1, 2004, Samuel Oteng and Harold Gladden, two naval officers, rented a room at the Tides Inn in Norfolk, Virginia so that they could hold a going away party.  Upon checking in, they noticed some women at the hotel and greeted them.  The women, unbeknownst to the sailors, were members of the BHB.  Oteng and Gladden invited the women to come to the party later that night, but they never showed.  After the party had broken up around 2:00 a.m. and the guests had left, Gladden and Oteng were confronted by three men carrying guns outside their hotel room.  One of the men grabbed Oteng's gold chain off his neck and then attempted to force him into the room.  To avoid being trapped in the room with armed individuals, Oteng offered to let the men search his car for money, and the men took his keys and drove the car away.  Oteng ran after them to see where the men were taking the car.  As he was doing so, a shot was fired.  One of the female members of the BHB present at the hotel that night testified that Mix fired the shot and was one of the men who threatened the sailors that evening.

3.

In April 2006, John Doe, the leader of the BHB, heard that Rich Porter, a drug dealer, accused him of false flagging. In response, Doe ordered Toliver to get Porter and bring him to Doe's house in Coleman Place. Toliver drove to Porter's house, showed him a 9mm handgun, and demanded he get in the car. Toliver then drove Porter to Doe's house where Doe interrogated him about the rumors he was spreading. Ultimately, Doe let Porter go.

4.

In spring 2007, two men broke into Andre Parham's house and demanded money from him. Parham was a drug dealer with whom the BHB did business. The men hit Parham and burned him on his back with an iron before departing. Later that evening, the men came back and started pounding on his door. Parham responded by shooting through the door. On August 20, 2007, Parham was again the victim of a home invasion. He became unconscious after the men entered his home and beat him. He was again burned with an iron and cut on his arm. John Doe testified that Toliver was present at that home invasion with other members of the BHB and stole heroin and guns.

5.

In July 2007, Timothy Minter, Jamal Ashe, and James Robertson, Minter's cousin, were all spending time together in

8

Norfolk where Minter and Ashe were stationed with the Navy. One night, after dinner, they met two women in front of the pizza parlor where they ate. The women did not have a car, so they offered to drive the women home. Robertson asked for their phone numbers, but the women preferred to take his number from him.

Later, on July 27th, Robertson received a call from one of the women inviting him to hang out. He accepted and drove with Minter and Ashe to 16th Bay in Norfolk where the girls had indicated they would be. When Robertson, Minter, and Ashe pulled into the parking lot, they saw seven girls as well as one man.

After Robertson, Minter, and Ashe exited the car, and began speaking with the group, ten men ran out from an alley and approached them holding guns. The men demanded money and started beating Robertson, Minter, and Ashe and stripped off their clothes. One of the women began to get nervous because of the level of beating, and she shouted "police" to get the attackers to scatter. Ashe and Minter were able to run away to safety, but Robertson was already unconscious. Minter and Ashe both suffered significant contusions and abrasions from the beating. Robertson never regained consciousness and died of acute brain injury due to blunt force trauma from being beaten in the head with a shotgun.

Through investigation and canvassing after the incident, the police found the vehicles involved in the robbery and murder and tracked them to a hotel room. There, they arrested six suspects, all members of the BHB, including the women who called Robertson. In interviews with the suspects, the police determined that Curtis Newby, also known as CK or Crip Killer, was the individual who had beaten Robertson. Skylar Hayward, a member of the BHB and one of the girls Robertson met earlier, stated that Curtis Newby, also a BHB member, told the girls to call Robertson because he wanted to rob him.

When John Doe saw a report on television about the murder, he called Mix and told him what had happened. Mix told him that CK had beaten a man to death with a shotgun that Mix owned. He said that he was going to take CK to New York to hide out with Cody in Mount Vernon.

6.

Also on July 27, 2007, John Doe accompanied Toliver and several other BHB members to Club Reign on Granby Street in Norfolk. After the club let out, Doe, along with the others, passed out copies of a CD he had made of rap about the BHB to patrons leaving the club. When a car occupied by two men refused to take a CD, the situation escalated, ending when Antonio Fulford shot both of the occupants of the car as they attempted to flee, one in the leg, one in the hand. To leave

10

the scene of the shooting, all of the BHB members jumped in their car with Toliver driving. Responding to reports that a white truck had fled the scene, a Norfolk police officer attempted to pull over the car that Toliver was driving. Instead of stopping, Toliver fled, and the resulting high speed chase ended when he crashed on an exit ramp.

7.

In October 2007, Gregory Lee, a gun and drug dealer with whom the BHB did business, had an argument with Toliver after Toliver shorted Lee $400 on a gun deal. At that time, Lee called Toliver a young punk. On November 15, 2007, at 9:00 a.m., Lee heard pounding on his door and someone yell "DEA search warrant." When he opened the door, two men ran in the house, pistol whipped him, handcuffed him, duct-taped him to the toilet, and hit him with a baseball bat. The men also stole $8,162 in cash from him. The men told Lee "we may be wearing black, but we are red inside," which he took to mean that they were BHB members. They also told Lee that "the young punk sent us."

C.

Mix and Toliver were also involved in a wide variety of drug trafficking activity. Because the instances of such conduct involved a large number of witnesses and occasions, we summarize the evidence in bullet form.

11

- 2002 – Angel Hines begins buying cocaine from Mix, purchasing eighteen ounces from him about every two weeks for two years.

- 2002 – Joyce Wright observes Mix with a quarter ounce of cocaine and a gun in his car.

- March 2003 – John Doe was supposed to sell Mix seven ounces of crack, and Mix wanted to trade for three guns. Doe would not accept the deal so Mix paid him $250 for the seven ounces.

- Spring 2004 – Mix gives John Doe $5,500 to buy half a kilo of cocaine.

- January 2006 – Gregory Lee starts buying heroin from Toliver and buys an increasing amount from him daily until November 2007.

- 2006 – Doe supplies Mix with 2.25 ounces of crack twice a week for several months.

- 2006 – Doe supplies Toliver with nine ounces of cocaine every two days.

- Mid-2006 – Toliver asks Gregory Lee to purchase firearms for him, and Lee sells him twenty firearms total.

- November 2006 – Jamal Ruiz starts buying cocaine from Toliver and continues to purchase it through August 2007.

- January 2007 – Toliver buys 3.5 grams of heroin from Lahmel Evans and shows him a handgun while doing so.

- Spring 2007 – Toliver gives Doe $75,000 to purchase three kilos of cocaine.

- Spring 2007 – Gregory Lee receivs raw heroin from Toliver and works to put it in gel caps.

- July 4, 2007 – Skylar Hayward buys marijuana from Toliver and sees him in possession of crack.

- October 2007 – Gregory Lee buys a quarter ounce of crack from Toliver, who carried a gun with him.

D.

In February 2008, Toliver and Mix, along with John Doe, and Antonio Fulford, were indicted for the above-described criminal activity. On May 7, 2008, the government filed a seventy-six count superseding indictment. While Fulford and Doe chose to plead guilty, Mix and Toliver proceeded to jury trial, which began on August 18, 2008, and continued for eight days. After the government had concluded its case-in-chief, it requested a dismissal of several counts of the indictment.[2] The remaining counts were sent to the jury, which deliberated for three days before arriving at a verdict. The jury found Toliver guilty of all counts for which he was tried. The jury found Mix guilty of all of the offenses except as to Counts Four (possession of a firearm in furtherance of a violent crime), Five (assault with a dangerous weapon in aid of racketeering activity), Six (assault with a dangerous weapon in aid of racketeering activity) and Seven (possession of a firearm in furtherance of a violent crime), which related to the incidents at the VFW dance and the Tides Inn. At sentencing, Toliver was sentenced to life plus

_____

[2] Counts 23, 24, 30-36, 39-42, 44, 49, 50-53, and 55-57 were dismissed.

2,484 months.  Mix was sentenced to life plus 480 months.  This timely appeal followed.

## II.

On appeal, Toliver and Mix raise issues concerning joinder, jury selection, photographic evidence of Toliver's tattoos, and sufficiency of the evidence.  We address each in turn and find all of their arguments unavailing.

### A.

Toliver first raises the issue of prejudicial joinder.  He argues that he was prejudiced by his joint trial with Mix and Elizabeth Horne[3] because the allegations against the other defendants necessarily "spilled over" in the minds of the jury considering his guilt and influenced their verdict.  Additionally, Toliver argues that the sheer volume of the evidence, including the murder Mix was charged with, confused the jury and prejudiced them against him.  We find, however, that no specific trial right of Toliver's was impaired by the joinder, and thus the defendants were properly joined.

---

[3] Horne was tried on several specific counts related to the home invasion of Andre Parham, her brother.  She was acquitted of all charges.

14

## 1.

The district court's denial of a motion for severance is reviewed for abuse of discretion. United States v. Jones, 356 F.3d 529, 535 (4th Cir. 2004). This Court will reverse only if "the trial court's decision to deny severance deprives the defendants of a fair trial and results in a miscarriage of justice." United States v. Harris, 498 F.3d 278, 291 (4th Cir. 2007) (citation omitted).

## 2.

Federal Rule of Criminal Procedure 8 governs joinder of defendants in the same action. It provides that "the indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Even if properly joined in the indictment, the defendants must be tried separately when the joinder "appears to prejudice a defendant or the government." Fed. R. Crim. P. 14. Therefore, if a defendant moves to sever his trial, he must show the requisite prejudice. The Supreme Court has held that to show prejudice as a result of joinder, the defendant must show that "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v.

15

<u>United States</u>, 506 U.S. 534, 539 (1993) (emphasis added).  Thus, "a defendant is not entitled to severance merely because separate trials would more likely result in acquittal, or because the evidence against one defendant is not as strong as that against the other."  <u>United States v. Strickland</u>, 245 F.3d 368, 384 (4th Cir. 2001) (citation and internal quotation marks omitted).

3.

This Court has never held that jury confusion requires severance of defendants properly joined in an indictment.  <u>See</u> <u>United States v. Mandel</u>, 591 F.2d 1347, 1371 (4th Cir. 1979) ("Severance will not be granted when the claim is based on the disparity of evidence adduced against individual defendants without a strong showing of prejudice.").  Indeed, this Court has enforced the Supreme Court's decision in <u>Zafiro</u>, that the defendant must show a specific trial right that would be infringed by the joinder, and has found no abuse of discretion when the defendant merely pleads jury confusion between defendants.

Taking into account how this precedent weighs against his claim, Toliver intimates that joinder with Mix would violate <u>Bruton v. United States</u>, 391 U.S. 123, 129-31 (1968), which held that admission of the confession of a defendant at trial was prejudicial error when that confession implicated the

16

codefendant. However, Bruton and the Sixth Amendment do not support such an expansive argument. General concerns about prejudice when being tried with another defendant who has committed bad acts does not rise to the level of a Bruton problem when those acts do not implicate the defendant. Here, Mix's connection with the robbery and murder of James Robertson did nothing to implicate Toliver because he was not mentioned at all in connection with the incident.

Therefore, because we do not find, and Toliver does not argue, any specific trial right of his which was impaired by the joinder, the district court did not abuse its discretion in denying his motion for severance.

B.

Toliver and Mix jointly raise the second issue on appeal concerning the dismissal of empanelled jurors. In this case, as described more fully below, two African-American female jurors were dismissed after the jury had been empanelled because of disqualifying conflicts they disclosed after they had been sworn in. The defendants argue that the district court erred in denying their motion for a mistrial because they were denied the use of voir dire by the jurors' incomplete answers. Additionally, they argue that striking two jurors at the beginning of the trial reinforced the "pervasive ambiance of fear" surrounding the trial and prejudiced them. We hold that

17

the district court properly dismissed the jurors and replaced them with substitutes that had been empanelled for that specific purpose.

### 1.

As the defendants contemporaneously objected to the dismissal of the two jurors and substitution of the alternates, the district court's decision is reviewed for abuse of discretion. United States v. Hayden, 85 F.3d 153, 156-57 (4th Cir. 1996). To establish that a new trial is warranted, the objecting party must establish first that the substitution was in error, and second that prejudice resulted from the substitution. United States v. Nelson, 102 F.3d 1344, 1349 (4th Cir. 1996). To determine prejudice, we have held that the district court should consider three general factors: (1) the closeness of the case; (2) the centrality of the issue affected by the error; and (3) the steps taken by the district court to mitigate that error. United States v. Callanan, 450 F.2d 145, 151 (4th Cir. 1971).

### 2.

On the first day of the trial, jury selection began in the morning and continued until approximately 2:00 p.m., at which time the jury with two alternates was empanelled and sworn in. The court then recessed for lunch. One juror, during the lunch hour, notified the deputy that she recognized Toliver because

18

his uncle attended her church and she went to school with his father. When questioned by the court, she stated that she had not said anything earlier because it did not occur to her that it was the same Toliver, and she could not see him. She was then dismissed for cause after she indicated that she could not be fair because she felt "empathy" for the defendant. The dismissed juror was an African-American woman; her replacement was a white man.

After the first day of trial was completed and before the second day began, the court received a note from another female African-American juror. The juror stated that she found out from her brother the night before that he was assaulted in New York by a gang six years earlier, and she could no longer be impartial because remembering the incident brought up strong emotions. When questioned, she told the court that she had not talked to her family about the case, but her relatives figured out which jury she was on, and her brother called her from New York and told her about the incident. She also was dismissed and replaced with a white male juror.

The defendants moved for a mistrial on the basis of the substitution of the jurors for members of another gender and race. They also moved for a mistrial on the suspicion of juror intimidation given the circumstances. The court found that

19

there was no intimidation involved and that substitution was proper at this stage of the proceedings.

3.

Substitution of jurors at trial is regulated by Federal Rule of Criminal Procedure 24(c).  It provides that alternate jurors are to "replace any jurors who are unable to perform or who are disqualified from performing their duties."  Fed. R Crim. P. 24(c)(1).  A court replacing an empanelled juror with an alternate must have both a legally relevant reason and a factual basis for doing so.  Hayden, 85 F.3d at 157.  The court must also consider reasonable alternatives available to it instead of dismissing the juror and substituting an alternate, given the importance attached to keeping the original jury together if possible.  Nelson, 102 F.3d at 1349.

However, this Court has concluded that the "right to have the selected jury render the verdict is not absolute and is subject to the inevitable vagaries of the many trial participants' complex lives."  Id. at 1350.  Thus, both in Hayden and Nelson, we affirmed a district court's decision to dismiss jurors after jeopardy had already attached.  In Hayden, the court dismissed a juror when a government witness, after he testified, alerted the court that he and the juror knew each other.  Although the jurors had been questioned during voir dire about whether they knew any of the witnesses, the juror did not

20

recognize the witness's name because he only knew him by a nickname. The court dismissed the juror, and the defendant objected on the grounds that the juror dismissed was the only African-American on the jury. Hayden, 85 F.3d at 156-57. This Court held that the dismissal was proper because the juror was biased, and the district judge explained the dismissal to the jury. Id.

Additionally, in Nelson, the district court dismissed two jurors after the trial had begun because they had previously-set travel plans during the trial. The district court considered other alternatives, such as letting the jurors deliberate for a day and then continuing the trial during the period of the jurors' vacations, but concluded that it was most important to have the jury deliberate on consecutive days and not to feel rushed in their verdict. Nelson, 102 F.3d at 1349. The defendant objected and argued that because the two jurors who were dismissed were African-American and were replaced with white jurors, a heightened standard for replacing jurors should be employed. We held, however, that "[i]n the absence of any evidence or allegation that the court acted because of race in replacing jurors with alternates, we find no basis to conclude that the court's discretion should be exercised differently when it is considering for racially neutral reasons the replacement of black jurors with white alternates." Id. at 1350.

21

4.

Despite our precedent in <u>Nelson</u> and <u>Hayden</u>, Toliver and Mix argue that this case is distinct because the conflict did not arise after the trial had begun, but rather existed before the jury was even empanelled.  They thus argue that they were denied voir dire.

However, the district court certainly had legal cause and a factual basis for dismissing the jurors as required by our precedent.  It is without question that an outright statement by a juror that he cannot be impartial is a legally relevant reason for dismissing him.  <u>United States v. Capers</u>, 61 F.3d 1100, 1105 (4th Cir. 1995).  Further, the facts in this case do not support a departure from this Court's precedent which held that the same level of scrutiny should be applied, no matter the race of the dismissed juror.  Indeed, in <u>Hayden</u>, the juror did not immediately recognize the name of a witness, so it was only after the trial had begun that the conflict was apparent.  We held that dismissal of the juror and replacement with a white alternate was proper when there was a valid basis for removing the biased juror.  Thus, we believe that <u>Hayden</u> controls the outcome of this case.

Additionally, this case is distinguishable from <u>United States v. Rucker</u>, 557 F.2d 1046 (4th Cir. 1977), the case relied upon by the defendants for their voir dire argument.  In that

22

case, two jurors did not fully answer a question on their jury questionnaire as to whether any mental or physical impairment would prevent them from serving on the jury. The defendant requested that the court question the jurors on their incomplete answers, and the judge denied that request. We held that when presented with a potential question of whether a venireman is fit to serve on the jury, it is reversible error for the district court to fail to question the juror, as it denies the defendant the power of voir dire. Id. at 1047. This case has little in common with Rucker, however, because voir dire of the jurors here was complete. Indeed, the jurors were already qualified in this case and empanelled. Voir dire rights only exist in the pre-qualification stage of the trial, and the dismissals here demonstrated no bias by the district court. In fact the district court had no choice but to dismiss the jurors here when they stated that they could no longer be impartial.

Finally, it bears mentioning that while the defendants allege that there was a "pervasive ambiance of fear" surrounding the trial, there is no evidence in the record as to any intimidation in the case.[4] Therefore, the district court did not

---

[4] The defendants reference a newspaper article concerning juror intimidation in the case, but that article is not part of the record and the district court made no findings about intimidation.

abuse its discretion in denying the defendants' motion for a mistrial and properly dismissed the two impartial jurors.

## C.

The third issue on appeal is raised by Toliver and concerns photographic evidence of his tattoos which was admitted for the purpose of showing that he was a member of the BHB. Toliver argues that the admission of that evidence violated the Fifth and Sixth Amendments. We find each of these arguments without merit.

## 1.

Evidentiary rulings of the district court are reviewed for abuse of discretion if the defendant preserves his objection at trial. United States v. Basham, 561 F.3d 302, 325 (4th Cir. 2009). When a district court commits an error of law, it has abused its discretion. Id. at 326. If a defendant does not make a contemporaneous objection, the admission of such evidence will be reviewed for plain error. This Court will only notice the error if the defendant can show (1) an error occurred, (2) the error was plain, (3) the error affected his substantial rights, and (4) the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 736 (1993) (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)) (internal quotation marks omitted).

24

2.

On February 12, 2008, four days after his arrest, Toliver was required to allow the police to photograph his numerous tattoos. Those photographs were admitted into evidence, not for identification purposes, but rather as substantive evidence of his affiliation with the BHB. In particular, these photographs showed the following tattoos: the capital letters B.H.B. on the right side of his neck; the letter B with a five pointed crown on it on his right shoulder; the word GARRY burned into his flesh to form a scar; the words "known by many, loved by few, respected by all" on his leg; the word LOVE on his right arm with the word LOYALTY on his left; and the word WAR on his right hand with the word VIEW on his left.

Each of the photographs was authenticated by the officer who took the pictures, State Police Special Agent Smith, a member of the drug enforcement unit. The government further offered Special Agent Smith as an expert, and he was qualified as such, in the area of the symbols, colors, customs, and protocols of the BHB. After the picture of each tattoo was authenticated by Special Agent Smith, the government asked him what meaning the tattoo had for the BHB. Special Agent Smith responded, for example, that the LOVE and LOYALTY tattoos on Toliver's arms were two of the five prongs of the BHB creed, and the five pointed crown over the B stood for the five-pointed

25

star that was the symbol of the Bloods.  Special Agent Smith's analysis of the meaning of each tattoo was based on his specialized training on the BHB gang.

3.

Toliver's first argument concerning the photographs of his tattoos is that compelling him to be photographed violated his Fifth Amendment privilege against self-incrimination.  We, however, find that Toliver's tattoos are a physical trait, similar to his voice or handwriting, and therefore do not constitute testimony within the meaning of the Fifth Amendment.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  In general, the Fifth Amendment protects the accused from compelled verbal statements, but can also apply to compelled physical acts which constitute communications.  It is well settled, however, that the protections of the Fifth Amendment do not apply to physical characteristics such as the giving of a blood sample, voice sample, or handwriting exemplar. Pennsylvania v. Muniz, 496 U.S. 582, 595-98 (1990); United States v. Dionisio, 410 U.S. 1, 7 (1973); Gilbert v. California, 388 U.S. 263, 266-67 (1967).  The key distinction as to whether the Fifth Amendment applies is whether the incriminating communications, verbal or physical, are testimonial in nature. United States v. Hubbell, 530 U.S. 27, 34 (2000).

26

Toliver likens this case to the situation in Hubbell where the Supreme Court held that the mere act of producing documents, in some cases, may be incriminating. Id. at 36. In that case, the production itself communicated a "statement[] of fact"; it proved that the documents existed, were authentic, and were in the custody of the producer. Id. at 36 (citation and internal quotation marks omitted). There, the Supreme Court held that the physical production was a violation of the Fifth Amendment because the preparation of the produced documents was the only means through which the government obtained the evidence which led to the indictment. Id. at 42-43.

This case, however, is more akin to the physical trait cases. Tattoos which are openly visible on the body are physical traits, as are voice, appearance, and handwriting. See United States v. Bay, 762 F.2d 1314, 1315-16 (9th Cir. 1984) (holding that a defendant need not take the stand to be able to show the jury the tattoos on his hands which were an openly visible physical characteristic). Cf. United States v. Williams, 461 F.3d 441, 446-47 (4th Cir. 2006) (holding that a demonstration by the defendant that he could not physically wear the fanny pack as alleged by the police is not testimonial evidence). Here, except for the GARRY scar tattoo, the location of which is unknown, it is clear that all of Toliver's tattoos were openly visible on his body. Indeed, most of them,

27

including BHB on his neck, WAR and VIEW on his hands, the slogan on his leg, and LOVE and LOYALTY on his arms, were easily visible when he was wearing a tee-shirt. Only the B with the five point crown would have been covered up, and it would become easily visible were he to wear a tank top or take off his shirt. Thus, though the tattoos incriminated him because he had branded BHB slogans and symbols all over his body, they were an open physical characteristic outside the protections of the Fifth Amendment. Unlike in Hubbell, here the act of production was nothing more than merely allowing a cursory examination of Toliver's body as opposed to painstakingly combing through records in order to deliver the government its case.

Therefore, we find no merit to Toliver's Fifth Amendment challenge.

4.

Toliver's second argument concerning his tattoos is that Special Agent Smith's testimony violated the Confrontation Clause of the Sixth Amendment. He contends that Special Agent Smith based his expert opinion on testimonial statements by other gang members, thus importing those testimonial statements into the trial without giving him the opportunity to cross-examine the declarants. However, our precedent mandates the conclusion that Special Agent Smith's testimony was not a violation of the Sixth Amendment.

The question of when expert testimony violates the Confrontation Clause is well-settled in the Fourth Circuit. As we recently stated: "An expert witness's reliance on evidence that Crawford would bar if offered directly only becomes a problem where the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation." United States v. Johnson, 587 F.3d 625, 635 (4th Cir. 2009). If, on the other hand, the expert is "applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no Crawford problem. The expert's opinion will be an original product that can be tested through cross-examination." Id. In Johnson, this Court held that when experts testified as to the meaning behind intercepted phone calls concerning the sale of narcotics, their testimony did not violate the Confrontation Clause because the experts used their own considered judgments along with their training and information from informants. Id. at 636.

Here, although Toliver alleges that Special Agent Smith relied on testimonial statements by gang members, there is no such evidence in the record. Rather, the only evidence is that Special Agent Smith relied on his formal training to interpret the tattoos. Furthermore, even if he had relied on such

testimonial statements, Special Agent Smith's testimony was certainly more than a parroting of the statements of others. Instead, he considered the tattoos on Toliver's body and offered his independent opinion as to what each meant. Thus, his testimony poses no problem under the Confrontation Clause.

5.

Toliver's final argument concerning the admission of the testimony and photos of his tattoos is that they violated both Federal Rule of Evidence 404(b) and the Due Process Clause of the Constitution because they constituted character evidence. He argues that because the photographs were not introduced for identification purposes, they necessarily had the purpose of convincing the jury that Toliver was a bad person, predisposed to participating in the crimes alleged.[5] We find no violation of the Due Process Clause because evidence of the tattoos was properly admitted as evidence of his participation in the BHB, an element of the crime with which he was charged.

Rule 404 provides that "evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Fed.

---

[5] Toliver also argues that the tattoos were used as improper impeachment evidence, but that argument certainly must fail because the evidence was introduced during the prosecution's case-in-chief, and he never testified.

R. Evid. 404(a).  That same evidence may, however, be used for purposes other than showing the defendant's character, such as motive, intent, or identification, so long as the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice to the defendant.  Fed. R. Evid. 404(b); Fed. R. Evid. 403.

Toliver was charged under the RICO statute, and thus the government was required to prove that he was "employed by or associated with any enterprise" affecting its purpose through racketeering activity.  18 U.S.C. § 1962(c) (2006) (emphasis added).  The Supreme Court has held that an "enterprise" under the statute includes "a group of persons associated together for a common purpose of engaging in a course of conduct."  United States v. Turkette, 452 U.S. 576, 583 (1981); see also Boyle v. United States, 129 S. Ct. 2237, 2245-46 (2009) (holding that an enterprise under RICO need not have a business-like structure and can have a rather informal organization).  For an individual to be convicted of a RICO offense, therefore, the government must prove both that an enterprise exists and that the defendant participated in the enterprise through racketeering activity.

The enterprise alleged in this case was the BHB, a criminal gang dedicated to the sale of narcotics and pecuniary gain through robberies and home invasions.  The evidence offered by the government regarding how individuals were inducted into the

31

gang, its hierarchical structure, and the type of racketeering activity engaged in by its members was offered as proof of the existence of the enterprise.  Thus, the government was required to prove that Toliver participated in the BHB and its racketeering activities.  Given that the government was required to show Toliver's membership in the BHB as one of the elements of the substantive crime, the presence of the gang tattoos all over his body tended to show Toliver was a member, and the evidence was properly admitted to show that membership.

Additionally, this Court has held that "the Rule 404(b) inquiry applies only to evidence of other acts that are 'extrinsic to the one charged.'"  Basham, 561 F.3d 302, 326 (4th Cir. 2009) (quoting United States v. Chin, 83 F.3d 83, 87 (4th Cir. 1996)).  "Evidence of uncharged conduct is not 'other crimes' evidence subject to Rule 404 if the uncharged conduct 'arose out of the same series of transactions as the charged offense, or if [evidence of the uncharged conduct] is necessary to complete the story of the crime on trial.'"  United States v. Siegel, 536 F.3d 306, 316 (4th Cir. 2008) (quoting United States v. Kennedy, 32 F.3d 876, 885 (4th Cir. 1994)).  Therefore, even if Toliver's tattoos were considered evidence "extrinsic" to the charged crime of RICO, the photos would be admissible because the fact that Toliver had branded himself with BHB symbols

32

arises out of the same series of transactions, namely participation in a criminal enterprise, the BHB.

Thus, each of Toliver's challenges to the photographs and testimony concerning his tattoos must fail.

D.

The final issue raised by Mix and Toliver on appeal concerns sufficiency of the evidence. They both challenge their various drug and gun convictions, and Mix individually challenges his convictions for assault with a deadly weapon in aid of racketeering and accessory after the fact. We find that there was sufficient evidence such that a reasonable jury could have found all of the essential elements of the crimes charged, and affirm their convictions.

1.

In reviewing the evidence for sufficiency, this Court must view the evidence in the light most favorable to the government, drawing all inferences in the government's favor, and must affirm the verdict if any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Stewart, 256 F.3d 231, 249 (4th Cir. 2001) ("In evaluating the sufficiency of the evidence, the jury verdict must be upheld if there exists substantial evidence, including circumstantial and direct evidence, to support the

verdict, viewing the evidence in the light most favorable to the government.").

2.

Toliver and Mix jointly raise a sufficiency of the evidence challenge to their various drug and gun convictions. Their main contention is that given the complete lack of any physical evidence tying them to the crimes, in that no drugs or guns were introduced into evidence, it would be unconstitutional to uphold their sentences. However, the testimony at trial supports their convictions, and we affirm.[6]

Given the deference shown to the jury's verdict upon appeal, we have held that the uncorroborated testimony of a single witness may be sufficient to uphold the conviction, even if that witness has credibility problems. United States v. Wilson, 115 F.3d 1185, 1190 (4th Cir. 1997) (holding that the uncorroborated testimony of an informant may be sufficient to sustain a conviction); United States v. Baker, 985 F.2d 1248, 1255 (4th Cir. 1993) (uncorroborated testimony of an accomplice

---

[6] We are mindful of the defendants' argument that "Toliver and Mix were sentenced to the equivalent of several life terms based on the vague and unreliable testimony . . . [of] snitches and convicted felons seeking to feather their nest[s] for sentencing reductions or to stay out of jail entirely due to immunity agreements," yet we decline to reverse a jury verdict which is in fact supported by the testimony at trial. Pet'r Br. at 57.

sufficient to support conviction).  Furthermore, we are not to reweigh the credibility of witnesses upon appeal and are to assume that the jury found witnesses credible.  United States v. Reavis, 48 F.3d 763, 771 (4th Cir. 1995).  Thus, we inquire whether a reasonable jury, given the testimony before it, could have found the defendant guilty of the charge.

What the defendants charge is true:  the evidence presented by the government was composed of testimony by coconspirators who testified as to general dates on which the firearm and drug offenses occurred.  Additionally, it is true that much of the testimony about the gun and drug offenses had no corroboration, either from other witnesses or from physical evidence.  However, in reviewing the charges on which the defendants were convicted, there was testimony at trial which corresponded to each of the convictions.[7]  Thus, the jury could have reasonably found that the defendants committed the drug offenses with which they were charged.

---

[7] The defense offered the incarceration records of Toliver in order to establish that he could not have been dealing drugs at the time stated by the witness because he was incarcerated then.  Yet, the jury need not have found specific dates on which the offenses occurred, and we will not disturb its verdict if it could have rationally found the defendants committed the offenses.

3.

Mix then individually argues that his conviction for assault with a deadly weapon in aid of racketeering should be reversed because the jury found him not guilty of possession of a firearm in furtherance of a violent crime in relation to the same offense. His challenge to this conviction is unavailing for two reasons. First and foremost, the Supreme Court has held that defendants may not challenge verdicts which appear to be inconsistent on the basis that the verdict was in error. United States v. Powell, 469 U.S. 57, 66 (1984). Secondly, there is not necessarily anything inherently contradictory about the verdicts, as Mix was charged with aiding and abetting on the count for which he was convicted and there is no requirement that the principal be convicted in order for the aider and abetter to be convicted. United States v. Horton, 921 F.2d 540, 543-44 (4th Cir. 1990). Thus, the jury rationally could have found that Mix aided and abetted in the assault with a deadly weapon in furtherance of racketeering without having possessed or aided in the possession of any firearm.

4.

Mix finally argues that his conviction for accessory after the fact related to the murder of James Robertson is not supported by sufficient evidence because of perceived inconsistencies in the testimony concerning the incident.

However, viewing the evidence in the light most favorable to the government, there was certainly sufficient evidence to find that Mix aided in helping the killer, Curtis Newby, leave Virginia and hide out in New York. John Doe testified that Mix told him that he was taking Newby up to New York to hide out with Cody in Mount Vernon. Further, the jury heard testimony that, at the time of trial, Newby had just been extradited from New York to Virginia. A rational jury thereby could have found that Mix was an accessory after the fact to the murder.

## III.

For the reasons detailed above, both Mix's and Toliver's convictions are

AFFIRMED.